IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Isaac Payne, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No. |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| The Savannah College of Art and | ) | |
| Design, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

## **COMPLAINT**

COMES NOW, Plaintiff Isaac Payne ("Plaintiff" or "Mr. Payne"), by and through his counsel, and brings this *Complaint* for damages against Defendant The Savannah College of Art and Design, Inc. ("SCAD" or "Defendant").

### I.     **Introduction**

1.     Mr. Payne, a Black man, was a highly successful Men's and Women's Head Fishing Coach at SCAD from August 2015 until March 2018.

2.     During his tenure at SCAD, Mr. Payne endured a hostile work environment, threats, and discriminatory treatment because of his race and in retaliation for complaining up the ladder at SCAD about his discriminatory treatment.

3.     Ultimately, SCAD fired Mr. Payne because of his race and in retaliation for reporting race discrimination.

4.     As set forth herein, SCAD's conduct violated 42 U.S.C. § 1981 ("Section 1981").  Mr. Payne seeks compensatory damages caused by SCAD's illegal conduct, as well as punitive damages, attorneys' fees, and injunctive relief.

5.     Mr. Payne also seeks a declaratory judgment finding there was no agreement to arbitrate his disputes with SCAD.

**II.     Jurisdiction and Venue**

6.     The Court has subject matter jurisdiction over this action, which arises under federal statutory law.  *See* 28 U.S.C. § 1331.  The Court also has jurisdiction over the declaratory judgment claim in this action pursuant to 28 U.S.C. § 2201.

7.     Venue is proper in this district and division because Defendant is a resident of this district and division.  Defendant has sufficient contacts in this district to subject it to personal jurisdiction if this district were a separate state.

**III.     Parties**

8.     Mr. Payne is a resident of Gwinnett County, Georgia.  He submits himself to the jurisdiction of this Court.

9.     Mr. Payne is Black.

10.   Defendant SCAD is a Georgia domestic nonprofit corporation.

11.   SCAD is a university with campuses in Savannah, Georgia and Atlanta, Georgia.

12.   SCAD's Atlanta, Georgia campus is located in Fulton County, Georgia, within this district and division.

**IV.   Facts**

**A. Employment Discrimination and Retaliation**

13.   Plaintiff Isaac Payne was a student at SCAD from 2012 until 2015. He graduated *magna cum laude* with a Bachelor of Fine Arts degree in Industrial Design.

14.   He attended SCAD on the Post-9/11 GI Bill after serving honorably for eight years, including in combat, in the United States Marine Corps.

15.   While Mr. Payne was an undergraduate student at SCAD, he founded and was president of the university's Fishing Club.

16.   The Fishing Club was such a success under Mr. Payne's leadership, SCAD offered Mr. Payne a full-time position to develop and serve as Head Coach of the university's Men's and Women's Fishing Teams after he graduated.

17.   Mr. Payne accepted the position and started working as the Fishing Coach in August 2015.

18.     Competitive anglers are almost exclusively white. [1]

19.     The members of the SCAD Fishing Teams were no exception.  Over the course of the existence of the SCAD Fishing Teams, every student athlete, with one exception, was white.  The only student athlete on the Fishing Team who was not white—a Black man who Mr. Payne recruited to SCAD to join the Men's Fishing Team—left the Team and the university a short time after he enrolled.

20.     For the duration of his employment at SCAD, Mr. Payne was the only Black Head Coach of any SCAD athletic team.  The Head Coach of every other SCAD athletic team was white.  To this day, the Head Coaches of every SCAD athletic team are white.

21.     Upon information and belief, SCAD is unique among major colleges and universities in the region with respect to the total lack of racial diversity among its athletic teams' Head Coaches.

---

[1] *See* Paul Wachter, *Ish Monroe has found his perch in the heavily white world of bass fishing*, The Undefeated, https://theundefeated.com/features/ish-monroe-has-found-his-perch-in-the-heavily-white-world-of-bass-fishing/ (last visited Oct. 11, 2020) (calling the most prestigious competitive fishing tournament in the United States "one of the whitest American professional sports tours.")

22.     The populations of the Cities of Savannah and Atlanta, where SCAD's two campuses are located, are majority Black.[2]

23.     The SCAD Fishing Teams were successful under Mr. Payne's leadership.  Among other things, four members of the Men's Fishing Team qualified for the national championship tournament in 2017.  Further, two members of the Women's Fishing Team were the first women ever to qualify for a national fishing championship.  In fact, the Women's Fishing Team was the first all-female fishing team in the country.

24.     Over the course of Mr. Payne's tenure as fishing coach, he recalls receiving one formal performance review.  The review, which Athletics Director Doug Wollenburg delivered in writing and in person, took place on September 8, 2017, after Mr. Payne had been leading the fishing program at SCAD for two years.  The review was overwhelmingly positive.  Among other things, Mr. Wollenburg

    a.   Congratulated Mr. Payne for the seven national championship qualifications and for the "historic moment" of "qualifying the

---

[2] *See* U.S. Census Bureau Quickfacts: Atlanta, GA, https://www.census.gov/quickfacts/atlantacitygeorgia (last viewed Oct. 11, 2020); QuickFacts: Savannah, GA, https://www.census.gov/quickfacts/fact/table/savannahcitygeorgia,US/PST045219 (last viewed Oct. 11, 2020).

first team of women to a national championship in the history of competitive fishing."

b. Indicated Mr. Payne "conducts himself at all times as a professional, in the office, in the community, and on the water with his anglers. He follows all athletic and university policies and follows the university dress code even though he is in and out of the office practicing with his artist-athletes at different times of the day!"

c. Described Mr. Payne's "natural ability to get along with everyone in the Athletic Department as he exudes a positive contagious enthusiasm about his job and the college. In just a few short years, he has tremendous repore [*sic*] with all his colleagues and coaches gravitate towards him. He is a pleasure to have on my staff and I know that the SCAD Fishing Program is in good hands!"

d. Concluded, "I cannot wait until next year and years to come with Isaac at the helm of the SCAD fishing program."

25. Despite Mr. Payne's groundbreaking development of the Fishing Teams and his success as a coach, some of the student athletes on his team were

abusive toward Mr. Payne and harassed him because of his race.  They resisted many of his reasonable coaching mandates and ultimately targeted him in a campaign to have him fired.

26.     One group of student-athletes on the Fishing Team created a "Burn Book" directed at Mr. Payne.  Modeled after the "Burn Book" in the 2004 film *Mean Girls*, the purpose was to record and circulate grievances, rumors, and insults about Mr. Payne.    Upon information and belief, some of the entries in the "Burn Book" were fabrications.  Others were racially motivated insults.  Still others related to complaints about matters and decisions appropriately within the discretion of a collegiate coach, such as his decisions about where the team would dine and the dining budget during team trips.

27.     This group of student-athletes would not have created this "Burn Book" if Mr. Payne were a white coach.

28.     Upon information and belief, no member of this group of student athletes created or maintained a "Burn Book" directed at the white Head Coach who replaced Mr. Payne, though the white Head Coach made decisions, allowed conduct, and engaged in conduct that put student athletes' safety at risk.

29.     Upon information and belief, no member of this group of student athletes created a "Burn Book" directed at any white faculty or staff at SCAD.

30.     One of the student instigators of the "Burn Book" frequently referred to Mr. Payne as a "nigger" or "piece of shit nigger" when the student was not happy with a decision Mr. Payne made.  No member of the team told the student not to use racist language.  In fact, some other members of the team laughed when the student used this language and piled on the verbal abuse.

31.     This unwelcome race-based abuse and harassment of Mr. Payne was so severe and pervasive as to create a hostile work environment.

32.     Mr. Payne raised this race-based hostile work environment to SCAD leadership on multiple occasions, including in February 2017 with Mr. Wollenburg and Amy Croshaw, SCAD's Academic Compliance Manager, very shortly after Mr. Payne became aware of the student's use of racist epithets.

*33.*     By raising the race-based hostile work environment to SCAD leadership, Mr. Payne was engaged in statutorily protected activity.

34.     At least one concerned student athlete also reported the racist language and abuse to Mr. Wollenburg.

35.     SCAD took no action to address the hostile work environment, and the abuse continued.

36.     SCAD leadership took no disciplinary action against the students who were engaged in the race-based abuse and harassment; nor did SCAD

leadership provide any support whatsoever to Mr. Payne to help him confront this treatment. The abuse continued, and SCAD ultimately fired Mr. Payne rather than confront the student athletes' racism.

37.     As is the prerogative and responsibility of collegiate coaches, Mr. Payne sought assistance from SCAD leadership to reign in alcohol, drug, and sexual abuse, as well as academic cheating and bribery, he witnessed and/or learned about among a group of the student athletes on his teams.

38.     Among other things, he reported an alleged sexual assault he learned about from other student athletes.

39.     SCAD leadership took no action, including disciplining student athletes, to reign in the alcohol, drug, and sexual abuse; upon information and belief, to meaningfully investigate the alleged sexual assault; or to address the academic integrity issues Mr. Payne reported.

40.     If Mr. Payne were a white Head Coach, SCAD leadership would have taken action, including disciplining student athletes, to address the reports of alcohol, drug, and sexual abuse; the alleged sexual assault; and the academic integrity issues.

41.     SCAD's failure to take action to address Mr. Payne's complaints further empowered some of the student athletes to step up their abuse of Mr.

Payne and contributed to the race-based hostile work environment.

42.     Upon information and belief, SCAD leadership did take action, including disciplining student athletes, on at least one occasion when a white Head Coach reported similar abuse.

43.     As is the prerogative and responsibility of collegiate coaches, Mr. Payne followed school and team policies to instill discipline on a small number of student athletes who missed workouts or did not meet the minimum academic standards to participate on the Fishing Teams.  The discipline ranged from assigning make-up workouts to sitting out competitions.

44.     Some of the disciplined student athletes and their parents lashed out at Mr. Payne and complained to SCAD leadership in ad hominem and false or manipulative attacks against nearly every aspect Mr. Payne's coaching.

45.     One white student athlete who Mr. Payne disciplined for missing workouts started flying a large confederate flag on his pickup truck.  He bragged about bringing guns on campus, openly talked about carrying a firearm in Savannah because he claimed if "those people" (referring to Black residents in Savannah) "did something" or "look at me wrong," he would not hesitate to pull it.  This white student athlete went to a later meeting with Mr. Payne, where Mr. Payne told him he would have to sit out a fishing tournament because of

violations of SCAD and team rules, with a visible holstered knife attached to his belt. The blade on the knife was three to four inches long. During the meeting, the student menacingly said, "I know what I have to do now." Mr. Payne reasonable viewed the visible knife, the timing of the student's prominent display of the confederate flag, the student's known possession of firearms, and the student's menacing statement as a physical threat based on Mr. Payne's race.

46.     Upon information and belief, the student athlete who Mr. Payne disciplined would not have displayed a weapon during the meeting or made the verbal threat if Mr. Payne were white.

47.     Mr. Payne reported the threat to SCAD leadership.

48.     Upon information and belief, the student's possession and display of the knife violated SCAD's weapons policy.

49.     Upon information and belief, the student possessed firearms on SCAD property, and the possession of the firearms on SCAD property violated SCAD's weapons policy.

50.     Because Mr. Payne is Black, SCAD leadership did not take the threat seriously. Even though, upon information and belief, the student's conduct violated SCAD's weapons policy, SCAD took no action and did not discipline the student in response to the possession and display of weapons and the threat.

51.     SCAD's failure to take disciplinary action against the student athlete who threatened Mr. Payne contributed to the hostile work environment.

52.     The scale and ire of the student athletes' and parents' attacks was far more severe than it would have been if Mr. Payne were a white coach.

53.     SCAD leadership responded to the student athletes and their parents' complaints differently than SCAD leadership would have responded if Mr. Payne were a white coach.

54.     Because Mr. Payne is Black and the student athletes and their parents are white, SCAD leadership accepted the veracity of the student athletes' and their parents' complaints and ultimately used these complaints as a pretext to fire Mr. Payne in retaliation for complaining about the race discrimination and hostile work environment he endured.

55.     If Mr. Payne were white, SCAD leadership would have supported Mr. Payne's disciplinary measures and his efforts to lead and manage the Fishing Teams.

56.     Upon information and belief, SCAD leadership supported similar disciplinary measures and team management efforts by team Head Coaches who were white.

57.     SCAD's support of the racially motivated complaints by the student athletes and their parents contributed to the race-based hostile work environment.

58.     On February 28, 2018, frustrated by SCAD's inaction, Mr. Payne again raised the hostile work environment, including the student's use of racial epithets, with Mr. Wollenburg.  He also raised it with Phillip Alletto, SCAD's Vice President for Student Success.

59.      The February 28, 2018 communications with Mr. Wollenburg and Dr. Alletto were statutorily protected activities.

60.     Five days later, on March 5, 2018, SCAD fired Mr. Payne.

61.     SCAD's firing of Mr. Payne was an adverse employment action.

62.     SCAD's firing of Mr. Payne was causally connected to Mr. Payne's statutorily protected activities.

63.     SCAD fired Mr. Payne because he was Black and as retaliation for Mr. Payne's complaints about racial discrimination, including the race-based hostile work environment.

64.     SCAD's decision to fire Mr. Payne was the culmination of a continuing practice of discriminating against Mr. Payne because of his race.

65.     After SCAD fired Mr. Payne, SCAD hired a white man to replace him as Head Coach of the Men's and Women's Fishing Teams.

66.     About a year later, SCAD shut down the Fishing Teams.

67.     Upon information and belief, to retain their athletic scholarships after the Fishing Teams were shut down, SCAD required one or more the student athletes to sign confidentiality agreements preventing them from publicly disclosing information about the drug, alcohol, and other abuse or harassment on the Fishing Teams.

68.     Upon information and belief, one reason SCAD required the Fishing Team members to sign the confidentiality agreement was to prevent the students from disclosing publicly SCAD's handling of Mr. Payne's complaints.

69.     Upon information and belief, SCAD would not have coerced the former Fishing Team members to sign the confidentiality agreement if Mr. Payne had not raised concerns about a race-based hostile work environment.

70.     At least one former Fishing Team member who witnessed, was troubled by, and had complained to SCAD leadership about the abuse and harassment on the Fishing Team refused to sign the confidentiality agreement.

71.     As a consequence of that student refusing to sign the agreement, SCAD did not renew that student's athletic scholarship.

72.     Mr. Payne suffered and continues to suffer severe emotional distress as a consequence of the race discrimination and retaliation he experienced at SCAD.

73.     Mr. Payne also has suffered and continues to suffer economic loss as a consequence of the race discrimination and retaliation he experienced at SCAD.

74.     SCAD undertook all of the actions and omissions alleged above either directly or through its agents who were authorized to undertake such actions and omissions.

75.     SCAD's actions were intended to, and did, create a hostile work environment based on Mr. Payne's race.

76.     Because of SCAD's malicious, willful, and outrageous conduct, which was undertaken with full knowledge that such actions were illegal, Mr. Payne seeks and is entitled to punitive damages from SCAD.

## B.  Unconscionable Arbitration Provisions

77.     SCAD claims to be "a university of acceptance and love"[3] and has pledged to "amplify Black voices."[4]  However, SCAD has attempted to

---

[3]  *A community of inclusion*, https://www.scad.edu/#:~:text=SCAD%20is%20a%20 university%20of,role%20in%20this%20important%20work. (last visited Nov. 29, 2020).

[4]  *Inclusion at SCAD*, https://www.scad.edu/about/scad-glance/inclusion-scad (last visited Nov. 29, 2020)

implement an arbitration policy that silences race-based grievances and disproportionately impacts faculty and staff of color.

78.     On or about August 30, 2015, Mr. Payne signed a "Staff Handbook Acknowledgment" ("the Acknowledgment") as a prerequisite to SCAD hiring him as the Fishing Teams' Head Coach.

79.     Among other things, the Acknowledgment indicates the signatory "agree[s] to read and comply with the policies contained in the [Staff Handbook], including the Alternative Dispute Resolution Policy and Agreement (the 'ADPRA')."

80.     SCAD provided Mr. Payne with the Acknowledgment as part of a stack of documents he was required to sign before he started working.

81.     SCAD did not provide Mr. Payne with time to carefully review the Acknowledgment before he signed it.

82.     SCAD did not provide Mr. Payne with the opportunity to review the Acknowledgment with an attorney before he signed it.

83.     Prior to Mr. Payne's employment, and for the entire time SCAD employed Mr. Payne, SCAD never provided him with a hard copy of 2015-2016 Staff Handbook, which contains the ADPRA.

84.    Though the Acknowledgment provided vague instructions to locate the Staff Handbook in SCAD's intranet, SCAD did not provide Mr. Payne with a copy of the Acknowledgment for his safekeeping.

85.    SCAD did not provide Mr. Payne the time or the opportunity to review the 2015-2016 Staff Handbook or the ADPRA before he signed the Acknowledgment.

86.    SCAD did not provide Mr. Payne the time or the opportunity to review the 2015-2016 Staff Handbook or the ADPRA with an attorney before he signed the Acknowledgment.

87.    Mr. Payne did not see the 2015-2016 Staff Handbook until SCAD's counsel provided it to his counsel a few weeks before Mr. Payne filed this lawsuit.

88.    The 2015-2016 Staff Handbook is 64 pages long, excluding the title page, the table of contents, and a description of the handbook's "purpose."

89.    The text of the 2015-2016 Staff Handbook is written in "Gotham Narrow" 9-point font, in two columns, with the approximate equivalent of 1.5 rows of space between the lines.

90.    The ADPRA is in pages 34-36 of the 2015-2016 Staff Handbook.

91.    The ADPRA is a single entry (number 806) of 142 entries in the 2015-2016 Staff Handbook, and it is a single entry among 39 under the "General University Policies" section of the handbook.  Other categories under "General University Policies" include rules governing the use of "Keys/Fobs" (number 801.1; before the ADPRA) and SCAD's "Smoke Free Environment" policy (number 820; after the ADPRA).  The 2015-2016 Employee Handbook does not use boldface or any other differentiation in font or presentation to draw a reader's eye to the ADPRA or otherwise to distinguish it from the other policies in the handbook.

92.    The ADPRA provides a procedure by which an aggrieved SCAD employee must proceed to arbitration but provides no such procedure for claims SCAD may bring against an employee.  Further, the ADPRA only allows SCAD to petition a court for "interim injunctive or other equitable relief" for disputes that, practically, in nearly every case would be brought by SCAD against an employee.  No such allowance is made for any interim injunctive or equitable relief an employee uniquely may seek against SCAD.  Finally, the ADPRA allows SCAD, but not the employee, to bypass enumerated pre-arbitration steps set forth in the ADPRA.  As such, the ADPRA lacks mutuality.

93.     The ADPRA provides SCAD the sole discretion to decide the location where any arbitration would take place.

94.     The ADPRA provides that the arbitrator "must be a retired federal judge unless a retired judge is not available to hear the dispute in a timely manner."  Upon information and belief, there is a single retired federal judge in Georgia who may be available to serve as an arbitrator.  As such, SCAD's ADPRA effectively pre-selects an arbitrator.

95.     The ADPRA provides that "[a]ttorney's fees, expert witness fees, and costs shall be paid by the respective parties unless the arbitrator awards otherwise."  Further, the ADPRA requires the non-prevailing party to bear the cost of the arbitrator's fees.  An employee's cost of arbitration, therefore, would be prohibitive, and the mandatory cost-shifting of the arbitrator's fees is not appealable under the ADPRA to a court of competent jurisdiction.

96.     The cost of arbitration would be prohibitive for Mr. Payne.

97.     The ADPRA requires that "all communications, information, documents, pleadings, and awards shall be deemed confidential."

98.     The ADPRA provides that any portion of the ADPRA declared void or unenforceable "shall be severed, and the remainder shall be enforceable."

99.    The ADPRA provides that any arbitration itself be conducted according to a separate Arbitration Procedures manual.  The Arbitration Procedures manual itself contains terms that are similarly unconscionable.

100.    The ADPRA provides that SCAD may modify or terminate the ADPRA on thirty days' written notice.

101.    Upon information and belief, SCAD did not provide Mr. Payne with written notice of any modifications to the 2015-2016 Staff Handbook, including the ADPRA contained therein.  For example, Mr. Payne did not receive written notice if or when SCAD issued the version of the Staff Handbook applicable in the 2016-2017 academic year or later.

102.    Other terms of the ADPRA are unconscionable and therefore render the ADPRA unenforceable.

103.    Because, upon information and belief, SCAD required members of the Fishing Teams to sign confidentiality agreements to continue to receive their athletic scholarships after SCAD shut down the teams, Mr. Payne will not be able to secure their voluntary cooperation with his investigation or participation in the arbitration, either via pre-hearing deposition testimony or production of relevant documents.  Because an arbitrator is powerless to subpoena non-parties

for pre-hearing discovery,[5] SCAD's overt acts thwart Mr. Payne's efforts to engage in reasonable pre-arbitration hearing fact-finding and effectively prevent him from vindicating rights that otherwise would be available to him were his civil rights claim to proceed in federal court.

## V.    Legal Claims

### Count I

### Violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981

104.    By this reference, Mr. Payne incorporates the above factual statements as if fully stated herein.

105.    Mr. Payne asserts this claim pursuant to 42 U.S.C. § 1981 against SCAD.

106.    The actions of SCAD, as set forth herein, violated Mr. Payne's rights to receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including his rights to enjoy and benefit from non-discriminatory employment relationships with SCAD and to not suffer retaliation for engaging in statutorily protected activities.

---

[5]  *See Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1159 (11th Cir. 2019).

*Discrimination*

107.   But for Mr. Payne's race:

    a.   Mr. Payne would not have been subjected to a race-based hostile

       work environment;

    b.   SCAD would have disciplined student athletes on the Fishing

       Teams who Mr. Payne reported as engaging in drug, alcohol, and

       sexual abuse, as well as academic integrity issues;

    c.   SCAD would have supported Mr. Payne when confronted with

       student athletes and their parents who complained about Mr.

       Payne's disciplinary decisions and coaching practices;

    d.   SCAD would not have fired Mr. Payne.

108.   As such, SCAD deprived Mr. Payne of his rights to enjoy and benefit

from non-discriminatory employment relationships with SCAD.

109.   SCAD's discriminatory and offensive treatment of Mr. Payne was

sufficiently severe that it created a hostile work environment in violation of 42

U.S.C. § 1981.

110.   Mr. Payne reasonably perceived his work environment to be hostile,

abusive, and discriminatory on the basis of his race.

111.   SCAD's hostile, abusive, and discriminatory treatment of Mr. Payne was unwelcome.

*Retaliation*

112.   SCAD fired Mr. Payne in retaliation for statutorily protected activities; namely because Mr. Payne reported and sought SCAD leadership's assistance in addressing race-based discrimination and a hostile work environment.

113.   SCAD's decision to fire Mr. Payne was causally connected to his protected activities.

*Damages*

114.   SCAD knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Mr. Payne of his rights.

115.   As a result of SCAD's unlawful acts, Mr. Payne has suffered injury to his property and person.

116.   Mr. Payne seeks all appropriate relief in an amount to be determined at trial, including, but not limited to:

      a.   Compensatory damages for Mr. Payne's financial losses;

      b.   Compensatory damages for emotional pain and suffering, including fright, nervousness, grief, anxiety, depression, worry,

mortification, shock, humiliation, indignity, embarrassment, panic, apprehension, terror, or ordeal experienced as a result of the deprivation of Mr. Payne's civil rights;

c.  Punitive damages for SCAD's malicious, willful, and outrageous conduct; and

d.  Attorneys' and experts' fees and costs of this action as set forth in 42 U.S.C. § 1988(b)-(c).

## Count II

## Declaratory Judgment with Respect to the Arbitration Provisions

117.  By this reference, Mr. Payne incorporates the above factual statements as if fully stated herein.

118.  For the reasons set forth in paragraphs 77-103, *supra,* Mr. Payne's alleged agreement to arbitrate is procedurally and substantively unconscionable, and therefore no arbitration agreement was made.

119.  Mr. Payne therefore seeks a declaratory judgment finding that the alleged agreement to arbitrate is not enforceable and that his claim under 42 U.S.C. § 1981 should proceed before this Court.

120.    Mr. Payne further seeks a declaratory judgment finding that the unconscionable terms of the alleged agreement cannot be severed, but rather the unconscionable terms invalidate any claimed obligation to arbitrate.[6]

121.    Mr. Payne demands a trial by jury to determine whether an agreement to arbitrate was made.[7]

**WHEREFORE**, Plaintiff respectfully requests the following relief:

a.    A trial by jury;

b.    Compensatory damages;

c.    Punitive damages;

d.    Appropriate injunctive relief;

e.    A declaration that the terms of SCAD's ADPRA are not enforceable;

f.    Reasonable attorneys' fees and costs; and

g.    Other legal and equitable relief as the court finds appropriate.

//

//

[Signature on Following Page]

---

[6]    *See Perez v. Globe Airport Sec. Servs., Inc., 253 F.3d 1280, 1287* (11th Cir. 2001) (citations omitted), subsequently vacated on procedural grounds*, Perez v. Globe Airport Sec. Serv., Inc., 294 F.3d 1275 (11th Cir. 2002).*

[7]    *See* 9 U.S.C. § 4.

Respectfully submitted this 10th day of December, 2020.

/s/ Daniel Werner
Daniel Werner
Georgia Bar No. 422070
dan@decaturlegal.com
James Radford
Georgia Bar No. 108007
james@decaturlegal.com
RADFORD & KEEBAUGH, LLC
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
(678) 271-0300

*Attorneys for Plaintiff*