## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ISAAC PAYNE,                :
                         :
        Plaintiff,         :
                         :     CIVIL ACTION FILE
v.                      :     NO.: 1:20-CV-5000-JPB-JCF
                         :
THE SAVANNAH COLLEGE OF   :
ART AND DESIGN, INC.,      :
                         :
        Defendant.      :

## ORDER and FINAL REPORT and RECOMMENDATION

This case is before the Court on the Refiled Motion to Dismiss and to Compel Arbitration filed by The Savannah College of Art and Design, Inc. ("SCAD" or "Defendant") (Doc. 35) and Plaintiff's Renewed Motion to Take Limited Early Discovery on Issues of Arbitrability (Doc. 40). For the reasons stated below, it is **RECOMMENDED** that SCAD's motion be **GRANTED**. Further, it is **ORDERED** that Plaintiff's motion be **DENIED**.

## PROCEDURAL BACKGROUND

On December 10, 2020, Plaintiff filed a complaint against Defendant. (Doc. 1). Defendant filed a Motion to Dismiss and Compel Arbitration on January 11, 2021. (Doc. 5). On February 1, 2021, Plaintiff filed his First Amended Complaint alleging race discrimination and retaliation in violation of 42 U.S.C. § 1981 ("§ 1981") and seeking a declaratory judgment that he did not enter into a valid

arbitration agreement with Defendant, that Defendant waived any right to arbitrate, and that the arbitration agreement is unenforceable and not severable. (Doc. 13). On February 4, 2021, Magistrate Judge Catherine Salinas entered a Report and Recommendation that Defendant's first Motion to Dismiss and Compel Arbitration be denied as moot. (Doc. 14). That recommendation was approved and adopted by the District Judge. (Doc. 19). On February 26, 2021, Defendant filed a Renewed Motion to Dismiss and Compel Arbitration ("Second MTCA"). (Doc. 20). Plaintiff filed a response brief (Doc. 26), and Defendant filed a reply brief. (Doc. 28). On May 10, 2021, Plaintiff filed a Motion To Take Limited Early Discovery On Issues Of Arbitrability ("First Discovery Motion"). (Doc. 30). Defendant responded (Doc. 31) and Plaintiff replied (Doc. 32).

On June 28, 2021, the undersigned issued an Order and Report and Recommendation that Defendant's Second MTCA be denied without prejudice, because SCAD had not proven all of the terms of the alleged arbitration agreement, and ordering that Plaintiff's First Discovery Motion be denied as moot without prejudice. (Doc. 33). The District Judge approved and adopted that recommendation. (Doc. 37).

On July 7, 2021, Defendant submitted a Refiled Motion to Dismiss and to Compel Arbitration ("Third MTCA"). (Doc. 35). Plaintiff responded on July 20, 2021. (Doc. 38). Defendant replied on August 3, 2021. (Doc. 39). On August 12,

2021, Plaintiff filed his Renewed Motion to Take Limited Early Discovery on Issues of Arbitrability ("Second Discovery Motion"). (Doc. 40). SCAD responded on August 20, 2021 (Doc. 41), and Plaintiff replied on September 1, 2021 (Doc. 42). The undersigned addresses the two most recent motions here.

## FACTUAL BACKGROUND

The facts for purposes of the present motions are derived from the documents attached to Defendant's Second MTCA (Doc. 20-1 at 29-105); the Declaration of Phil Alletto attached to Defendant's Second MTCA reply brief (Doc. 28-1 ("Alletto Decl.")); documents attached to Defendant's Third MTCA (Doc. 35-1); documents attached to Defendant's reply brief in Support of its Third MTCA (Doc. 39-1); documents attached to Plaintiff's response to Defendant's Third MTCA (Doc. 38-1 through 38-15); and documents attached to Plaintiff's First Discovery Motion (Doc. 30-2). [1]

## I.   Plaintiff's New Hire Orientation At SCAD

SCAD is an institution of higher education conferring bachelor and master degrees in art and design disciplines with locations in Savannah and Atlanta,

---

[1] In its Third MTCA, Defendant did not re-brief its arguments, but "refiles, adopts, and incorporates by reference its [Second MTCA] (Doc. 20), Brief in Support (Doc. 20-1), Reply Brief in Support (Doc. 28), and Declaration of Phil Alletto (Doc. 28-1)." (Doc. 35 at 1). Additionally, SCAD filed a Second Declaration of Jonathan Goldstein (Doc. 35-1 at 1-3 ("Second Goldstein Decl.")) and an authenticated copy of the Arbitration Procedures Plaintiff agreed to in 2015 (*Id.* at 5-18 (the "Arbitration Procedures")).

Georgia, among other places. (Doc. 20-1 at 29-33 ("First Goldstein Decl.") ¶ 3).[2]

Plaintiff, a black man, is the former head coach of SCAD's men's and women's

collegiate fishing teams. (Doc. 38-2 ("Pl. Decl.") ¶¶ 2, 11). Plaintiff was offered that

job in August 2015 and attended a new hire orientation on August 31, 2015. (Pl.

Decl. ¶¶ 11-12; First Goldstein Decl. ¶ 10).

At his orientation, Plaintiff signed several onboarding documents, including a

Staff Handbook Acknowledgment ("the Acknowledgment").[3] (First Goldstein Decl.

¶ 10; Pl. Decl. ¶ 14). The Acknowledgment states, "Each staff employee must

acknowledge that he/she received the staff handbook and understands that he/she is

responsible for reading, understanding and complying with the policies contained in

the handbook." (Doc. 38-5). It also provides instructions for accessing the staff

handbook on SCAD's intranet, MySCAD. (*Id.*). The Acknowledgment then states,

"I, Isaac Payne, hereby acknowledge that I received access to (through MySCAD)

or a hard copy of the SCAD Staff Handbook on August 30, 2015." (*Id.*). It then

provides:

> I further acknowledge that I understand that the Staff Handbook
> contains current policies of SCAD, and I agree to read and comply with

---

[2] Jonathan Goldstein ("Goldstein") is the Executive Director of Human Resources
for Defendant. (First Goldstein Decl. ¶ 1).
[3] Each party submitted a copy of the signed Acknowledgment (Doc. 20-1 at 104;
Doc. 38-5). Plaintiff declares he does not remember signing the Acknowledgment,
but he also admits the signature on the Acknowledgment is his and does not dispute
that he signed the document. (Pl. Decl. ¶ 14).

the policies contained in the handbook, including the Alternative Dispute Resolution Policy and Agreement (the "ADRPA").

I also understand that SCAD reserves the right to establish, change, or abolish any policy or practice at any time to meet the needs of the university, with the exception of the ADRPA, which is binding on SCAD and me as written, unless revised following the procedures set out in the ADRPA.

I understand and acknowledge that, except for the Alternative Dispute Resolution policy, the staff handbook does not create a contract with SCAD for any purpose.

(*Id.*).

Plaintiff states that SCAD's human resources ("HR") staff at his orientation did not mention the Acknowledgment specifically or explain that it bound him to arbitrate disputes with SCAD. (Pl. Decl. ¶ 15). He claims they rushed him through the onboarding paperwork, so he did not review the Acknowledgment before signing it. (*Id.* ¶ 16). Plaintiff also states he was not provided with a paper copy of the Staff Handbook during his orientation, and he did not have access to a computer during orientation to view an electronic copy of the Staff Handbook. (*Id.* ¶¶ 21, 23). Further, the HR staff took the Acknowledgment and other signed forms from him and did not provide him with his own copy, so he could not make use of the Acknowledgment's instructions for electronically accessing the Staff Handbook after orientation. (*Id.* ¶ 20). He did not receive other instructions for electronically accessing the Staff Handbook after he submitted his signed Acknowledgment. (*Id.* ¶ 22).

## II.   <u>The Staff Handbook, ADRPA, and Arbitration Procedures</u>

Defendant has produced a true and correct copy of the 2015-16 Staff Handbook referenced in the Acknowledgment. (First Goldstein Decl. ¶¶ 6-7; *see* Doc. 20-1 at 34-103). The Staff Handbook is sixty-four pages long, and the ADRPA is one of 142 entries. The table of contents in the Staff Handbook indicates that the ADRPA is in Section 806 of that document, beginning on page thirty-four. (Doc. 20-1 at 37, 73). The text of the ADRPA is not bolded or otherwise different from any other provision or text in the Staff Handbook, but it is set off by a bold title reading "Alternative Dispute Resolution Policy and Agreement". (*Id.* at 73). Within the ADRPA, there are no subject headings or subsection numbers to divide up the provisions. (*Id.* at 73-75). It is approximately three double-columned pages of text. (*Id.*).

As for its contents, the ADRPA lays out an alternative dispute resolution process involving "an internal review, mediation and binding arbitration to resolve all legal disputes that may arise between SCAD and an employee." (*Id.* at 73). Under the ADRPA, if the parties cannot resolve a dispute through the internal review process or mediation, the dispute can be arbitrated at the election of SCAD or the employee. (*Id.* at 74). The ADRPA states the "parties agree that the arbitration shall be conducted in accordance with and subject to, the rules and procedures set forth in the Arbitration Procedures." (*Id.*). Immediately after, the ADRPA provides a hyperlink for employees to access the Arbitration Procedures electronically through

6

MySCAD and states that paper copies of the Arbitration Procedures are available at SCAD's Office of Human Resources. (*Id.*). The ADRPA then states that the "ADRPA together with the Arbitration Procedures shall constitute the sole remedy and entire agreement between the employee and SCAD for the resolution of Disputes." (*Id.* at 75).

III. <u>**Plaintiff's Termination and SCAD's Settlement Offer To Pescitelli**</u>

Plaintiff was terminated from his employment with SCAD on March 5, 2018. (First Goldstein Decl. ¶ 11; Pl. Decl. ¶ 31). SCAD discontinued its fishing teams in May 2019. (Alletto Decl. ¶ 7).

According to Plaintiff, a former member of the men's fishing team, Noah Pescitelli ("Pescitelli"), who attended SCAD on a fishing scholarship, resigned from the team during the academic year after Plaintiff was terminated. (Pl. Decl. ¶¶ 34-36). Plaintiff declares Pescitelli complained to SCAD leadership during his time on the team "about some of the same issues [Plaintiff] had sought SCAD leadership's help in resolving[,]" referring to team members' conduct at the root of Plaintiff's discrimination claim. (*Id.* ¶ 35). He states that sometime after Pescitelli resigned from the team, representatives from SCAD asked Pescitelli and his parents to sign a confidential settlement agreement in exchange for a scholarship of $36,630 for the following academic year. (*Id.* ¶ 37). Plaintiff attaches a copy of that settlement offer

to his response brief. (Doc. 38-7). Pescitelli did not sign the settlement offer and did not receive the scholarship money. (Pl. Decl. ¶ 38).[4]

Alletto, SCAD's Senior Vice President for Admissions and Student Success who has firsthand knowledge of the circumstances surrounding the discontinuation of SCAD's fishing team, declares SCAD offered to maintain and continue the athletic scholarships for all then-current members of the fishing teams when it discontinued the team in May 2019. (Alletto Decl. ¶¶ 7-8). Alletto declares "SCAD did not require or request that Fishing Team members sign any confidentiality agreement in connection with this offer, or otherwise agree to confidentiality." (*Id.* ¶ 8). Alletto states that Pescitelli was not eligible to have his scholarship continued at that point because he had resigned from the team earlier that year in February or March 2019, at which point he forfeited his scholarship. (*Id.*¶¶ 9-10). According to Alletto, Pescitelli later obtained an attorney and threatened legal action against SCAD, and in an effort to resolve that threatened action, SCAD offered to reinstate Pescitelli's scholarship for the following academic year in exchange for a release of claims.[5] (*Id.* ¶ 11). Alletto concedes that settlement offer included a confidentiality

---

[4] Defendant objects to Plaintiff's sworn statements about the negotiations between Pescitelli and Defendant as hearsay that is outside of Plaintiff's personal knowledge. (Doc. 28 at 4; Doc. 41 at 10).

[5] Plaintiff disputes that evidence, stating in his second declaration that Pescitelli continued to receive his athletic scholarship for at least one academic quarter after he resigned from the team. (Doc. 30-2 ("Second Pl. Decl.") ¶ 7). Assuming Plaintiff's statement is true, it is not inconsistent with Alletto's evidence.

clause. (*Id.*). Pescitelli did not agree to the proposed settlement, and his scholarship was not reinstated. (*Id.*).

## IV.  <u>Modification Of ADRPA Since 2015</u>

In August 2019, SCAD modified the ADRPA. (Doc. 39-1 at 1-3 ("Third Goldstein Decl.") ¶ 3).[6] The only change made to the ADRPA in 2019 was the addition of a paragraph awarding attorneys' fees and costs of litigation to the "prevailing party" if a party files a suit in court to resolve claims that are subject to the ADRPA. (*Id.*; Doc. 39-1 at 41-43 ("2019 ADRPA")). That modification was later removed in March 2021. (*Id.*). Defendant admits Plaintiff was never given notice of those changes. (Second Goldstein Decl. ¶ 5). The Arbitration Procedures Plaintiff agreed to in 2015 have not been modified since that time. (*Id.*).

## V.  <u>SCAD's Arbitration Request</u>

On August 6, 2020, Plaintiff's counsel sent a letter to SCAD leadership raising Plaintiff's claims that are the subject of this suit. (Pl. Decl. ¶ 41; Doc. 38-8). On August 21, 2020, Defendant's counsel sent an email to Plaintiff's counsel insisting

---

Defendant's settlement offer to Pescitelli was made in July 2019 (Doc. 38-7 at 2). If Pescitelli resigned in February 2019, then he could have received his scholarship for at least one more academic quarter and then become ineligible to receive it thereafter, all before July 2019. Thus, during settlement negotiations with SCAD in July 2019, the parties would have been discussing the reinstatement of his scholarship, not its continuance.

[6] Goldstein's second declaration incorrectly stated that the modification occurred in 2020. (Second Goldstein Decl. ¶ 5).

that the ADRPA was binding on Plaintiff and governed this dispute. (Doc. 38-12, Declaration of Daniel Werner ("Werner Decl.") ¶ 3(a); Doc. 38-13 at 2). Defendant's counsel sent another email several days later containing copies of Plaintiff's signed Acknowledgment and the Arbitration Procedures. (Werner Decl. ¶ 3(a); Doc. 38-13 at 3). On October 14, 2020, Defendant's counsel emailed Plaintiff's counsel again insisting that the ADRPA was enforceable and indicating Defendant would move to enforce the ADRPA and seek costs and attorney's fees involved in doing so if Plaintiff elected to bring this lawsuit. (Werner Decl. ¶ 3(b); Doc. 38-14 at 3).

Plaintiff initiated this suit on December 10, 2020. After the procedural history described above, the Court has been presented with the two present motions. With briefing on these motions complete, the Court considers their merits.

## DISCUSSION

### I.   Defendant's Motion To Compel Arbitration

Defendant moves the Court to compel Plaintiff to arbitrate his claims pursuant to the parties' 2015 agreement and dismiss those claims from this Court. (Doc. 35). Defendant has demonstrated that the parties entered into a valid arbitration agreement that governs Plaintiff's § 1981 claims, and Plaintiff has refused to arbitrate those claims. Therefore, Defendant's motion should be granted.

#### a.   Defendant's Incorporation Of Previous Briefs

Before discussing the merits of Defendant's motion, the undersigned must address a preliminary matter. Plaintiff asserts that Defendant's motion should be dismissed because, rather than briefing its motion, Defendant "refiles, adopts, and incorporates by reference its Renewed Motion to Dismiss and to Compel Arbitration (Doc. 20), Brief in Support (Doc. 20-1), Reply Brief in Support (Doc. 28), and Declaration of Phil Alletto (Doc. 28-1)" and simply adds a second declaration from Goldstein to prove the existence of the relevant Arbitration Procedures. (Doc. 35 at 1). According to Plaintiff, he and the Court are "left to guess as to which arguments or section of the respective brief[s]" SCAD refers. (Doc. 38 at 2) (quoting *Biedermann v. Ehrhart*, No. 1:20-cv-1388-JPB, 2021 WL 1061794, at *1 (N.D. Ga. Mar. 19, 2021)). By way of example, Plaintiff notes that SCAD's incorporated brief supporting his Second MTCA references Goldstein's first declaration, but he claims SCAD "has replaced that declaration with the Second Goldstein Declaration in its newly Refiled MTCA." (Doc. 38 at 2). Further, Plaintiff notes that SCAD's incorporation of its twenty-five-page brief in support of its Second MTCA and its twenty-three-page reply brief in support of that motion, put together, exceed the twenty-five pages allowed for any brief filed in support of a motion under this District Court's local rules. LR 7.1(D), NDGa. Plaintiff also correctly notes that this Court has denied motions to dismiss where incorporated briefs exceeded the page

limit for a brief in the local rules. *Aldridge v. Travelers Home & Marine Ins. Co.*, No. 1:16-cv-1247-SCJ, 2019 WL 8439150, at *1 (N.D. Ga. Feb. 21, 2019).

The Court will not deny Defendant's motion on these grounds and ask the parties to file briefs on this matter for the fourth time. Defendant's decision to incorporate its previous briefs into the brief supporting its present MTCA has undoubtedly made deciphering its arguments more difficult. However, it has not made the task impossible. Plaintiff's counsel has apparently been able to interpret Defendant's factual and legal positions and respond appropriately. (Doc. 38). Plaintiff's lone specific concern regarding Goldstein's first declaration is unfounded. Defendant intended Goldstein's second declaration to supplement his first declaration, not replace it. Defendant said in its Third MTCA that it incorporates its "Brief in Support [of its Second MTCA] (Doc. 20-1)." (Doc. 38 at 1). It appears Defendant intended to incorporate all of docket number 20-1, which contains Goldstein's first declaration and several other vital documents referenced in that brief. Further, Defendant explained that it filed Goldstein's second declaration "in addition" to the incorporated documents. (Doc. 38 at 1). Defendant also clarified in its reply brief supporting the Third MTCA that Goldstein's second declaration was not intended to replace his first. (Doc. 39 at 3 n.3). The Court should also exercise its discretion to excuse Defendant exceeding the page limit for a brief in the local rules without permission from the Court. It does not appear that Plaintiff had

inadequate space to respond to Defendant's incorporated arguments or was otherwise prejudiced by Defendant exceeding the page limit, largely because he also exceeded the page limit, albeit with permission. Thus, to prevent delaying the resolution of this arbitrability dispute any further, the undersigned will not dismiss it on these procedural grounds. Instead, the undersigned has considered the briefs and supporting documents and reached a recommendation on Defendant's motion.

### b.  Law Governing Defendant's MTCA

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, was enacted in 1925 "to reverse longstanding judicial hostility toward arbitration." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005). The FAA reflects "a liberal federal policy favoring arbitration agreements." *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1288 (11th Cir. 2005). One purpose of the FAA is "to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that is speedier and less costly than litigation." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir. 1998).

The FAA applies to any "written provision in any … contract evidencing a transaction involving commerce." 9 U.S.C. § 2. "The Supreme Court has interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest

permissible exercise of Congress' Commerce Clause power." *Caley*, 428 F.3d at 1370 (quoting *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 874 (11th Cir. 2005)). Here, because SCAD's overall employment practices affect commerce, the alleged agreement here is governed by the FAA. *See id.* at 1370 ("Because Gulfstream's overall employment practices affect commerce, the Commerce Clause requirement is satisfied."). Moreover, the ADRPA expressly states it is "promulgated pursuant to the [FAA]" and "shall be conducted in accordance with the [FAA]." (Doc. 20-1 at 74).

To determine whether to grant a motion to compel arbitration under the FAA, "the Court must assess whether: '(1) there is a valid written agreement to arbitrate; (2) the issue [sought to be arbitrated] is arbitrable under the agreement; and (3) the party asserting the claims has failed or refused to arbitrate the claims.'" *Lomax v. Woodmen of the World Life Ins. Soc'y*, 228 F.Supp.2d 1360, 1362 (N.D. Ga. 2002) (citation omitted). The undersigned takes those issues in turn below.

### c.  <u>Parties Entered Into A Valid Arbitration Agreement</u>

The Court must first address any arguments regarding whether the parties formed a valid contract. *Regan v. Stored Value Cards, Inc.*, 85 F.Supp.3d 1357, 1360 (N.D. Ga. 2015) ("A court must first consider 'any formation challenge to the contract containing the arbitration clause,' [] because 'a party plainly cannot be bound by an arbitration clause to which it does not consent.'") (citations omitted).

"The threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Bazemore v. Jefferson Capital Systems, LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). "Absent such an agreement, 'a court cannot compel the parties to settle their dispute in an arbitral forum.'" *Id.* (quoting *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004)). "[S]tate law generally governs whether an enforceable contract or agreement to arbitrate exists." *Caley*, 428 F.3d at 1368 (citing *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). "The 'federal policy favoring arbitration, however, is taken into consideration even in applying ordinary state law.'" *Id.* (quoting *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004) (quotation marks and citation omitted)). The parties agree that Georgia contract law governs the issue of formation.

Plaintiff does not challenge whether the parties formed an agreement to arbitrate in 2015. Rather, he argues Defendant has failed to prove the terms of the version of the contract governing this dispute, which he styles as a formation challenge. (Doc. 38 at 8-12). Under Georgia contract law, the parties formed a valid agreement to arbitrate in 2015. The later modifications SCAD made to that agreement never went into effect against Plaintiff, because he was never notified of those modifications. Therefore, the 2015 agreement governs this dispute, and Plaintiff's formation challenge fails.

### i.  <u>The Parties Formed A Contract</u>

Under Georgia law, a binding contract exists when there is "(1) a definite offer and (2) complete acceptance (3) for consideration." *Johnson v. Macy's South, LLC*, No. 1:07-cv-1256-WSD, 2007 WL 2904126, at *3 (N.D. Ga. Sept. 27, 2007) (quoting *Caley v. Gulfstream Aerospace Corp.*, 333 F.Supp.2d 1367, 1374 (N.D. Ga. 2004)). Here, the ADRPA constituted an offer to form an agreement to arbitrate. The ADRPA stated that "acceptance of employment or the continuation of employment by an individual shall be deemed acceptance of this ADRPA." (Doc. 20-1 at 75). Plaintiff worked for Defendant for several years, and therefore accepted the ADRPA offered to him at his 2015 orientation according to its terms. Further, Plaintiff signed the Acknowledgement in August 2015, which says that Plaintiff agreed to read and comply with the ADRPA, that the ADRPA was binding on SCAD and himself as written, and that the ADRPA created a contract between SCAD and himself. (*Id.* at 104). As for consideration, the ADRPA also states, "The employee has agreed to mediate and then arbitrate his/her Disputes against SCAD and, in return, SCAD has agreed to mediate and then arbitrate any Disputes it may have against the employee[,]" and "[t]he mutual obligations set forth in this ADRPA shall constitute a contract between the employee and SCAD…." (*Id.*). Those mutual promises to resolve disputes through arbitration constitute valid consideration to form a contract. *See Caley*, 428 F.3d at 1376 ("Georgia law provides that mutual promises and

16

obligations are sufficient consideration to support a contract.") (citing *Atlanta Six Flags P'ship v. Hughes*, 191 Ga. App. 404, 381 S.E.2d 605 (Ga. Ct. App. 1989)); *see also Thi of Georgia at Shamrock, LLC v. Fields*, No. CV 313–032, 2013 WL 6097569, at *4 (S.D. Ga. Nov. 18, 2013) ("[T]he parties' mutual promise to resolve any disputes…through arbitration suffices as consideration."). Plaintiff does not challenge any of those elements of contract formation under Georgia law. (Doc. 38 at 8-12).

Previously, the Court found that Defendant's Second MTCA must be denied because SCAD had not proven the existence of all the terms of the arbitration agreement it was seeking to enforce, namely, the Arbitration Procedures mentioned in the ADRPA. (Doc. 33 at 10-15). However, Defendant has submitted with its Third MTCA a certified copy of the Arbitration Procedures Plaintiff agreed to in August 2015. (Doc. 35-1 at 5-18; Second Goldstein Decl. ¶ 3). Those Arbitration Procedures, along with the ADRPA that was already in the record, reflect the terms of the entire arbitration agreement between the parties.

### ii.  The 2015 ADRPA Governs This Dispute

Plaintiff argues Defendant has failed to prove the existence of the version of the arbitration agreement "*applicable in 2020*, the time SCAD first demanded Mr. Payne submit his dispute to arbitration." (Doc. 38 at 8). This challenge fails.

17

The 2015 ADRPA states, "SCAD retains the right to modify or terminate this ADRPA and the Arbitration Procedures on thirty days' written notice. The policy, if any, in effect at the time a request for mediation and/or arbitration is initiated, will govern the process by which the Dispute is resolved." (Doc. 20-1 at 75). Defendant requested that Plaintiff's claims be submitted to arbitration in August 2020. (Doc. 38-13; 38-14). Thus, according to the terms of the 2015 ADRPA, this dispute should be governed by the versions of the ADRPA and Arbitration Procedures that were "in effect" in August 2020.

Defendant asserts in its Third MTCA that the 2015 ADRPA and Arbitration Procedures were still "in effect" between these parties in August 2020, so they should govern this dispute. (Doc. 35 at 1-2). To support that position, SCAD cites to the second declaration of Goldstein, wherein Goldstein declares that the Arbitration Procedures Plaintiff agreed to in 2015 have never been modified, so they have been in effect as to both parties since 2015. (Second Goldstein Decl. ¶ 5). There is no doubt that the 2015 Arbitration Procedures govern this dispute. However, the evidence shows the ADRPA *was* modified in August 2019. (Third Goldstein Decl. ¶ 3). Plaintiff was not given notice of those modifications (the "2019 ADRPA"), so Defendant asserts they never went into effect against Plaintiff, meaning the 2015 ADRPA was still in effect against him in August 2020. (Doc. 35 at 2; Second Goldstein Decl. ¶¶ 5-6; Doc. 39 at 6-7). Plaintiff argues that the modification

18

provision of the ADRPA is ambiguous as to which version of the ADRPA was "in effect" in August 2020 and that the ambiguity must be resolved against SCAD as the drafter, making the 2019 ADRPA or no version applicable to this dispute. (Doc. 38 at 10-12).[7] Alternatively, Plaintiff suggests the Court allow limited discovery into the parties' intended meaning of the "in effect" language. (*Id.* at 11-12). In reply, Defendant insists that the 2015 ADRPA governs this dispute. It also enters a copy of the 2019 ADRPA into the record and offers to let Plaintiff decide which version of the ADRPA he would like to apply. (Doc. 39 at 6-7).

The 2015 ADRPA governs this dispute, as it is the version of the ADRPA that was "in effect" between these parties when arbitration was requested in August 2020. The "in effect" provision is not ambiguous, as Plaintiff insists, but can only reasonably be read one way. The only reasonable interpretation of that provision, in

---

[7] Plaintiff actually argues first that SCAD's evidence supports Plaintiff's position that the 2019 ADRPA governs this dispute, because Goldstein's second declaration states the 2019 "modification *did apply to Plaintiff* because SCAD did not provide written notice of it to former employees." (Second Goldstein Decl. ¶ 5) (emphasis added). However, from context, it is clear that statement from Goldstein contained a scrivener's error and was supposed to say the 2019 ADRPA did *not* apply to Plaintiff. It would be illogical to conclude that the 2019 modification applied to Plaintiff "*because* SCAD did not provide written notice" of it, when the modification provision says changes are only effective "on thirty days' written notice." (Doc. 20-1 at 75). Further, in the next paragraph of his declaration, Goldstein states "the ADRPA (Doc. 20-1 at 73-75)…governs this dispute." (Second Goldstein Decl. ¶ 6). That is a citation to the 2015 ADRPA. Thus, the Court disregards Plaintiff's argument that the 2019 ADRPA governs here to the extent it relies on Mr. Goldstein's scrivener's error.

context of the entire ADRPA, is that it intended for any dispute between the parties to be governed by the version of the ADRPA in effect *between these two parties* when arbitration was requested. The Court reaches that conclusion for several reasons.

First, the modification provision immediately preceding the "in effect" provision dictates that any modification to the ADRPA can only occur "on thirty days' written notice." The clear implication is that any modification to the original agreement *does not take effect* against any person to whom SCAD does not give thirty days' written notice. In light of the modification provision, the "in effect" provision can only reasonably be read as referring to the version of the ADRPA in effect *between the parties* at the time arbitration was requested. Any other reading would be illogical. It simply cannot be read as meaning the parties wanted a dispute between them to be governed by a modified version of the ADRPA that was in effect "as to incoming employees"*,* "as to employees who had received proper notice of the modification", "as to most other employees", or some other tortured reading that would allow the 2019 ADRPA to be enforced against Plaintiff. Any such reading would mean the parties intended that Plaintiff be governed by a version of the ADRPA he was not properly notified of, and therefore could not have assented. The modification provision flatly says otherwise. Here, SCAD did not notify plaintiff of the 2019 modification to the ADRPA, so, according to the modification provision,

that version never went into effect against him. Therefore, the "in effect" provision cannot be reasonably read as stating that the parties intended for SCAD to be able to enforce the 2019 ADRPA against Plaintiff.

Secondly, nothing in the ADRPA indicates that the parties intended for their original agreement, the 2015 ADRPA, to become void or unenforceable if SCAD failed to provide notice of a modification. Importantly, the modification provision does not explicitly say as much. Moreover, the ADRPA's severability clause demonstrates that the parties intended for any unenforceable modification to the agreement to be severed. The ADRPA states, "Should any term or provision of this ADRPA or the Arbitration Procedures, or portion thereof, be declared void or unenforceable, it shall be severed, and the remainder shall be enforceable." (Doc. 20-1 at 75). In discussing severability of a term in an arbitration agreement, the Eleventh Circuit has held:

> If all the provisions of the arbitration clause are enforceable, then the court must compel arbitration according to the terms of the agreement. If, however, some or all of its provisions are not enforceable, then the court must determine whether the unenforceable provisions are severable. Severability is decided as a matter of state law. *Anders [v. Hometown Mortg. Servs., Inc.*], 346 F.3d 1024, at 1032 (11th Cir. 2003). If the offensive terms are severable, then the court must compel arbitration according to the remaining, valid terms of the parties' agreement. The court should deny the motion to compel arbitration only where the invalid terms of the arbitration clause render the entire clause void as a matter of state law.

*Terminix Int'l Co. LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1331 (11th Cir. 2005).

> In Georgia, a contract may be either entire or severable. If a contract is severable, the part of the contract that is valid will not be invalidated by a separate part that is unenforceable. The intent of the parties determines whether a contract is severable. "[S]everability clauses are enforceable under Georgia law and the FAA requires that arbitration agreements be treated no less favorably than other contracts under state law."

*Webb v. Doordash, Inc.*, 451 F.Supp.3d 1360, 1367 (N.D. Ga. 2020) (internal citations omitted). "The parties' intent may be expressed directly, through a severability clause[.]" *Vegesina v. Allied Informatics, Inc.*, 257 Ga. App. 693, 694 (2002).

As explained above, any purported modification to the ADRPA that Plaintiff was not provided notice of is unenforceable against him. In addition, as shown by SCAD's submission of a certified copy of the 2019 ADRPA into the record, the only difference between the two versions at issue is that the 2019 ADRPA has an additional paragraph awarding attorneys' fees and costs of litigation to the "prevailing party" if a party files a suit in court to resolve claims that are subject to the ADRPA. (Third Goldstein Decl. ¶ 3; Doc. 39-1 at 41-43). The severability clause demonstrates that the parties did not intend for one unenforceable modified provision to void the entire original agreement between the parties. Rather, pursuant to the severability clause, the prevailing party provision can just be severed, leaving

only the terms of the 2015 ADRPA *remaining in effect* against Plaintiff. Therefore, in August 2020, the 2019 modification was not in effect against Plaintiff, but the 2015 ADRPA was *still in effect* against him.[8]

Even if the relevant provisions were ambiguous and could be read as meaning the 2015 ADRPA, 2019 ADRPA, or no version of the ADRPA could have been in effect against Plaintiff in August 2020, the Court should resolve that ambiguity in favor of SCAD and require that the 2015 ADRPA govern this dispute. Plaintiff contends in several places that any ambiguity surrounding the "in effect" or modification provisions must be resolved against SCAD as the drafter of the contract. (Doc. 38 at 10) (citing *First Acceptance Ins. Co. of Georgia, Inc. v. Hughes*, 305 Ga. 489, 496 (2019)). In *Hughes*, the Supreme Court of Georgia said, "[I]f an agreement 'is capable of being construed two ways, it will be construed against the preparer and in favor of the non-preparer. OCGA § 13-2-2(5).'" *Hughes*, 305 Ga. at 496 (quoting *Hertz Equip. Rental Corp. v. Evans*, 260 Ga. 532, 533, 397 S.E.2d 692 (1990) (citation and punctuation omitted)). The Georgia statute cited in *Hughes* and *Evans* contains the following rule of contractual interpretation: "If the construction

---

[8] Plaintiff argues that the "in effect" provision contemplates the possibility that no version of the ADRPA would be in effect when arbitration is requested between the parties, because it states "[t]he policy, *if any*, in effect at the time a request…is initiated" will govern arbitration. But that language is referring to the possibility that the ADRPA was explicitly terminated prior to a dispute arising, as is contemplated in the modification/termination provision. (Doc. 20-1 at 75) ("SCAD retains the right to modify *or terminate* this ADRPA….").

[of a contract] is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred." OCGA § 13-2-2(5). However, any ambiguity here should be resolved in Defendant's favor. Georgia's statutory rules for contractual interpretation also state, "The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part[.]" OCGA § 13-2-2(4) (Westlaw 2010) (emphasis added). Additionally, the federal court's policy favoring arbitration must still be considered when applying state laws of contractual interpretation to an arbitration agreement governed by the FAA. *Caley*, 428 F.3d at 1368. Here, if the contract is construed to state that no version of the ADRPA was in effect against Plaintiff in August 2020, then the arbitration agreement would essentially be void. Thus, in order to "uphold [the] contract in whole" and satisfy the federal policy favoring arbitration, any such reading should be rejected. If the contract is construed to mean the 2019 ADRPA was in effect against Plaintiff in August 2020, then Plaintiff could argue that version of the contract is unenforceable because he was not notified of it and did not assent to it. Thus, to uphold the contract, the Court rejects that construction as well.[9]

---

[9] Even still, if any ambiguity were resolved in such a way that the 2019 ADRPA governed this dispute, SCAD's motion could still survive, because it has provided proof of that version of the agreement.

Lastly, Plaintiff's authority on this issue is all distinguishable, as each of those cases involved a lack of evidence that those plaintiffs ever assented to an arbitration agreement in the first place. *Bazemore*, 827 F.3d at 1330-32 (affirming denial of defendant's motion to compel arbitration against credit card holder because defendant failed to produce any competent evidence of the terms or existence of the supposed arbitration agreement); *Mason v. Midland Funding LLC*, 815 Fed. App'x 320, 324-27 (11th Cir. 2020) (affirming denial of Midland Funding's motion to compel arbitration against credit card holder because Midland Funding failed to submit competent evidence establishing the terms of the supposed arbitration agreement or that the plaintiff ever received an electronic or hard copy of those terms) (citing *Bazemore*, 827 F.3d at 1330-32); *Reed v. Eastside Medical Center, LLC*, No,. 1:19-cv-03967-SDG, 2020 WL 5659436, at *5-7 (N.D. Ga. Sept. 23, 2020) (denying motion to compel arbitration because defendant did not establish authenticity of electronic signature on arbitration agreement and did not show the plaintiff assented to the arbitration clauses in the credit card agreement). Here, there is no dispute that Plaintiff assented to the 2015 ADRPA in August 2015.

For those reasons, the terms of the 2015 ADRPA and Arbitration Procedures were in effect between the parties when Defendant requested arbitration in August 2020. Defendant has produced an authenticated copy of those documents. Therefore,

Defendant has met its burden of proving the terms of the governing arbitration agreement.

### d. **Delegation Of Arbitrability**

Next, Defendant asserts that any challenge to the enforceability of the arbitration agreement should not be resolved by this Court, as questions of enforceability have been delegated to the arbitrator by the terms of the agreement. (Doc. 20-1 at 8). The arbitration agreement does not clearly and unmistakably delegate questions of enforceability to arbitration in § 1981 claims. Therefore, the Court must decide Plaintiff's enforceability challenges.

Parties to an arbitration agreement "may agree to arbitrate gateway questions of arbitrability including the enforceability, scope, applicability, and interpretation of the arbitration agreement." *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017) (citing *Rent–A–Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). "Indeed, an agreement to arbitrate these gateway issues 'is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.'" *Id.* (quoting *Rent–A–Center*, 561 U.S. at 70). "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *Id.* (quoting *First Options*, 514 U.S. at 943)

26

(citations omitted) (emphasis in original). Such an antecedent agreement is often called a "delegation provision." *Id.* (citing *Rent–A–Center*, 561 U.S. at 68). The Supreme Court has held that courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 1267 (quoting *First Options*, 514 U.S. at 944; *accord AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("[T]he question of arbitrability ... is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.")).

If "an arbitration agreement contains a delegation provision—committing to the arbitrator the threshold determination of whether the agreement to arbitrate is enforceable—the courts only retain jurisdiction to review a challenge to that specific provision." *Id.* (quoting *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1144 (11th Cir. 2015)). "Only if we determine that the delegation clause is itself invalid or unenforceable may we review the enforceability of the arbitration agreement as a whole." *Id.* (quoting *Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1335 (11th Cir. 2016)). But a court can examine a challenge to a delegation provision only if the claimant "challenge[d] the delegation provision directly." *Id.* (quoting *Parnell*, 804 F.3d at 1144). In other words, Plaintiff "must have alleged that the delegation

27

provision specifically—and not just the agreement as a whole—can be 'defeated by fraud, duress, unconscionability, or another generally applicable contract defense.'" *Id.* (quoting *Parnell*, 804 F.3d at 1146) (quotations omitted).

Here, there are two provisions in the ADRPA that address delegation of arbitrability disputes. The first provision states, "[T]he arbitrator shall have the authority to determine whether, and to what extent, this ADRPA applies to a Dispute between SCAD and an employee." (Doc. 20-1 at 74) ("First Delegation Provision").[10] The second provision states:

> For Disputes involving non-competition, nonsolicitation, fiduciary or confidentiality obligations, as well as Disputes involving trade secrets, trademarks or intellectual property, the employee or SCAD may, without inconsistency with the ADRPA, petition any court of competent jurisdiction and seek interim, injunctive or other equitable relief until the arbitrator award is rendered or the Dispute otherwise resolved, provided that the employee may not petition any court concerning the enforceability of this ADRPA and the arbitrator shall have the sole authority to determine whether, and to what extent, this ADRPA applies to a Dispute between SCAD and an employee."

(*Id.* at 74-75) ("Second Delegation Provision"). The parties disagree about what questions those provisions delegate to an arbitrator. Further, Plaintiff directly

---

[10] The Arbitration Procedures contain a nearly identical provision that states, "The Arbitrator shall have the authority to determine whether, and to what extent, the Alternative Dispute Resolution Policy and Agreement applies to a dispute between the College and an employee." (Doc. 35-1 at 11). Because that provision is substantively identical to the one in the ADRPA, the Court does not address it separately.

challenges the enforceability of the delegation provisions, arguing they are unconscionable due to the fee-shifting that could result from having to arbitrate questions of arbitrability. The Court addresses those issues in turn.

### i.  <u>Whether Provisions Delegate Questions Of Enforceability</u>

In its brief supporting its Second MTCA, SCAD argues that the language of the two delegation provisions shows "the parties' intent to delegate all issues of arbitrability to the arbitrator." (Doc. 20-1 at 8). Plaintiff disagrees, contending that the two provisions are far from a "clear and unmistakable" delegation of questions regarding the arbitration agreement's enforceability, which is the relevant question here. First, Plaintiff argues that the omission of the word "sole" in the First Delegation Provision should be read as giving an arbitrator the non-exclusive authority to determine "whether, and to what extent, this ADRPA applies to a Dispute between SCAD and an employee[,]" leaving the door open for this Court to decide such questions. (Doc. 38 at 13-14). According to Plaintiff, the omission of "sole" in the First Delegation Provision must be given meaning because it is included in the Second Delegation Provision. (*Id.*). In the Second Delegation Provision, arbitrators are specifically given "sole authority to determine whether, and to what extent, this ADRPA applies to a Dispute between SCAD and an employee[,]" but that provision is limited by the first clause of that sentence restricting its applicability

to certain types of legal claims, none of which underly this suit.[11] (*Id.*). Second, Plaintiff argues that the First Delegation Provision only delegates questions of *applicability* to arbitrators, not questions of *enforceability*, which form the basis of Plaintiff's arbitrability challenges here. (*Id.* at 14). Plaintiff asserts that "applicability" deals with questions such as whether the ADRPA applies to his § 1981 claims, whereas "enforceability" pertains to questions such as whether the arbitration agreement is unconscionable. (*Id.*). Thus, according to Plaintiff, his enforceability challenges are not delegated to an arbitrator under the First Delegation Provision, because it only delegates questions of applicability. (*Id.* at 14-15). It is implicit in Plaintiff's arguments that the Second Delegation Provision does not apply to this suit because of its first clause limiting its applicability to only certain types of legal disputes that are not relevant here.[12] In its reply brief supporting its Second MTCA, incorporated into its Third MTCA, SCAD rejects Plaintiff's "semantic games" regarding the use of the word "sole". (Doc. 28 at 6-7). Further, SCAD argues that the ADRPA's delegation of authority to determine questions of "applicability"

---

[11] The first clause of the sentence containing the Second Delegation Provision limits its applicability to "[d]isputes involving non-competition, nonsolicitation, fiduciary or confidentiality obligations, as well as Disputes involving trade secrets, trademarks. or intellectual property[.]" (Doc. 20-1 at 74-75). Plaintiff's § 1981 claims and his declaratory judgment claim regarding the arbitrability of this suit do not fit into any of those categories.

[12] Plaintiff's arguments in his response to the present MTCA are identical to his response to the Second MTCA. (*See* Doc. 26 at 11-14).

should not be distinguished from its delegation of authority to determine questions of "enforceability" because "[w]hether the ADRPA is enforceable is necessarily part and parcel of any determination of 'whether, and to what extent, the ADRPA applies to a Dispute between SCAD and an employee.'" (*Id.* at 7). In other words, as SCAD puts it, "if the enforceability of the ADRPA were intended to be excluded from the ADRPA's broad delegation of arbitrability to the arbitrator, presumably the ADRPA would have said so." (*Id.* at 8). Finally, in SCAD's reply brief supporting the present MTCA, it appears to argue for the first time that the enforceability disputes here are delegated to an arbitrator because the ADRPA "encompasses and includes all legal claims or controversies between SCAD and an employee, regardless of type." (Doc. 39 at 8) (quoting Doc. 20-1 at 73).

The Court has carefully considered with the arguments on this question of delegation. After much deliberation, the Court finds the ADRPA does not clearly and unmistakably delegate disputes over the enforceability of this arbitration agreement to an arbitrator.

In explaining that conclusion, it is helpful to begin by identifying what the ADRPA does clearly and unmistakably delegate. The First Delegation Provision plainly delegates questions of the ADRPA's "applicability" to any dispute between

SCAD and Plaintiff.[13] However, that does not constitute a broad delegation of all arbitrability questions, as SCAD asserts. Arbitrability is an umbrella term that encompasses questions of contract formation, enforceability, scope, applicability, and interpretation, among other things. *Jones*, 866 F.3d at 1262 (finding the arbitration agreement there contained a broad delegation provision expressing intent to arbitrate all questions of arbitrability, "including questions concerning the interpretation, applicability, enforceability, and formation of the agreement."); *Granite Rock Co. v. Int'l Broth. Of Teamsters*, 561 U.S. 287, 299-300 (2010) (listing "enforceability" and "applicability" separately when discussing questions of arbitrability that must be resolved by a court "absent a valid provision specifically committing such disputes to an arbitrator"); Arbitrability Definition, *Black's Law Dictionary* (11th ed. 2019), *available at* Westlaw (listing questions of "whether the parties entered in an enforceable agreement" separately from "whether the dispute is within the scope of the arbitration agreement"). Defendant cites no authority for the notion that delegating questions of an agreement's "applicability" to a particular legal claim also delegates all questions of arbitrability, such as enforceability. The bottom line is that "enforceability" and "applicability" are separate and distinct types of arbitrability disputes that can arise of out an arbitration agreement. Therefore, the

---

[13] The term "dispute" as used in the ADRPA "encompasses and includes all legal claims or controversies between SCAD and any employee regardless of type." (Doc. 20-1 at 73).

delegation of questions regarding "whether, and to what extent, this ADRPA applies to a Dispute between SCAD and an employee" does not clearly and unmistakably delegate disagreements over the agreement's enforceability.

For the same reasons, SCAD's argument that questions of enforceability are "part and parcel" of questions of applicability must fail. (Doc. 28 at 7). Similar provisions in other cases demonstrate that the two sub-categories of arbitrability are viewed as separate and distinct types of arbitrability disputes. *Jones*, 866 F.3d at 1262; *Githieya v. Global Tel\*Link Corp.*, No. 1:15-cv-0986-AT, 2016 WL 304534, at \*3 (N.D. Ga. Jan. 25, 2016) ("The arbitrator…shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms of Use[.]"); *Parnell*, 804 F.3d at 1148 (holding that all issues of arbitrability were delegated by the provision committing to arbitration "any issue concerning the validity, enforceability, or scope [applicability] of this loan or the Arbitration agreement."). That is particularly true where, as in the Second Delegation Provision in this case, the parties list questions of enforceability separately from questions of applicability. The listing of enforceability and applicability as separate matters in the Second Delegation Provision is evidence that the parties might not have intended the First Delegation Provision to encompass questions of enforceability. That doubt regarding the

delegation of enforceability challenges is enough to prevent the First Delegation Provision from clearing the high bar of the "clear and unmistakable" standard.

The Second Delegation Provision also does not clearly and unmistakably delegate enforceability challenges *in § 1981 discrimination and retaliation claims*. That provision does state that employees "may not petition any court concerning the enforceability of this ADRPA", but that clause is preceded by a qualifying clause that could be read as limiting its applicability to disputes "involving non-competition, non-solicitation, fiduciary or confidentiality obligations, as well as Disputes involving trade secrets, trademarks or intellectual property[.]" Perhaps the qualifying clause was not meant to apply to the Second Delegation Provision. Perhaps it was only intended to apply to the clause immediately following the qualifying clause, which says the parties in such disputes "may, without inconsistency with the ADRPA, petition any court of competent jurisdiction and seek interim, injunctive or other equitable relief until the arbitrator award is rendered or the Dispute otherwise resolved…." However, it is not unreasonable to read the qualifying clause as applying to the entire remainder of the sentence, including the Second Delegation Provision. In other words, the Second Delegation Provision could be read as only prohibiting Plaintiff from bringing challenges to the enforceability of the contract where the underlying dispute involves non-competition, non-solicitation, fiduciary or confidentiality obligations, trade secrets,

trademarks, or intellectual property. None of those claims are involved here. Thus, the Second Delegation Provision does not clearly and unmistakably delegate enforceability challenges to an arbitrator in the present case.

Lastly, to the extent SCAD argues that the language in the ADRPA broadly defining the term "dispute" in that agreement delegates all arbitrability questions to an arbitrator, that argument fails. The ADRPA states, "The term 'Dispute'… encompasses and includes all legal claims or controversies between SCAD and any employee regardless of type." (Doc. 20-1 at 73). In attempting to distinguish the present case from *S. Tr. Ins. Co. v. Guidewire Software, Inc.*, No. 5:20-cv-00327-TES, 2020 WL 6879259 (M.D. Ga. Nov. 23, 2020), cited by Plaintiff, SCAD notes that the arbitration provision in *Guidewire* contained similar language to that in the ADRPA's definition of "dispute." In *Guidewire*, the arbitration agreement said that "arbitration…shall be the exclusive remedy to resolve any disputes between the parties arising in connection with this Agreement…." *Guidewire*, 2020 WL 6879259, at *3. The Court there stated it was tempted to read "any and all disputes" as encompassing disputes over arbitrability, but decided that provision was not specific enough to delegate questions of arbitrability, comparing it to more specific delegation provisions that meet the "clear and unmistakable" standard. *Guidewire*, 2020 WL 6879259, at *3-4 (citing *Jones*, 866 F.3d at 1267). The Court is not convinced that *Guidewire* stands for the notion that a broad definition of "dispute"

35

in an arbitration agreement can encompass questions of arbitrability. In fact, it stands for the opposite conclusion. Thus, this argument by SCAD fails.

For those reasons, the delegation provisions in the ADRPA do not clearly and unmistakably delegate disputes over the arbitration agreement's enforceability to an arbitrator in § 1981 claims such as this one. The Court must resolve Plaintiff's arbitrability challenges.

### ii.  Plaintiff's Enforceability Challenge To Delegation Provision

Plaintiff also directly challenges the enforceability of the delegation provisions, contending in a footnote that "any delegation of arbitrability to the arbitrator also is substantively unconscionable because of the ADRPA's fee-shifting requirement." (Doc. 38 at 12 n.8). In doing so, he incorporates an argument from later in his brief that the ADRPA is substantively unconscionable, and therefore unenforceable, because of the fee-shifting provision contained therein. (*Id.* at 22-25). If the District Judge agrees with the undersigned's conclusion that the ADRPA does not delegate Plaintiff's enforceability challenges to an arbitrator, then he does not need to evaluate the enforceability of the delegation provisions themselves. However, if the District Judge disagrees with the undersigned's analysis of the scope of the delegation provisions and finds that they do delegate Plaintiff's enforceability challenges, then the issue of whether the delegation provision is enforceable would

36

require attention. Out of an abundance of caution, the undersigned conducts that analysis here and finds that the delegation provision is enforceable.

As discussed more fully below in Part I.e.ii.2.a. of this discussion, *infra*, Plaintiff asserts that the arbitration agreement is unconscionable because of its cost-shifting provision, which states that an arbitrator "shall require the non-prevailing party to bear the cost of the arbitrator's fees, provided however, that SCAD will advance the cost of the arbitrator's fees at the initiation of the arbitration, subject to reimbursement by the employee following arbitration if the employee does not prevail." (Doc. 20-1 at 74). However, for the reasons explained below, Plaintiff's objection regarding the costs of arbitration that could be forced upon him if he did not prevail at arbitration is premature. Part I.e.ii.2.a., *infra*. The Court cannot conclude that Plaintiff is likely to be the non-prevailing party in an arbitration of the merits of his claim. Therefore, the Court cannot determine whether the costs Plaintiff might face at an arbitration on the merits of his claim will prohibit him from vindicating his statutory rights under § 1981. Part I.e.ii.2.a, *infra*.

On the other hand, the analysis of the cost-shifting provision as it pertains to the delegation provisions is different. If Plaintiff is forced to arbitrate his challenges to the enforceability of the arbitration agreement, he is likely to lose on those issues at arbitration for the reasons laid out below in the rest of this decision. If the arbitrator's fees for arbitrating the enforceability of the contracted are shifted

entirely to Plaintiff under the cost-shifting provision, he will have to pay an estimated $8,400, according to his expert witnesses' estimates. (Doc. 38-11 ("Szalai Decl.") ¶¶ 9-17). However, Plaintiff does not provide evidence that having to pay $8,400 in arbitrator's fees would prohibit him from being able to vindicate his §1981 claims. (Pl. Decl. ¶¶ 45-59). Instead, he makes the broader declaration that having to shoulder the estimated $48,000 of arbitrator's fees for arbitrating an arbitrability dispute *and* the merits of his § 1981 claims would be financially disastrous for him and cost prohibitive. (*Id.* ¶¶ 57-59). Thus, there is no evidence that arbitrating the arbitrability dispute alone will prevent him from vindicating his right under § 1981. Therefore, Plaintiff's fleeting argument that the delegation provisions are unconscionable to the extent they force him to arbitrate questions of arbitrability must fail. If the District Judge concludes the delegation provisions do delegate Plaintiff's enforceability challenges, the delegation provisions are valid and enforceable.

### e.  <u>Whether The Arbitration Agreement Is Enforceable</u>

Having determined that this Court has authority to resolve questions of the arbitration agreement's enforceability in this suit, the Court reaches Plaintiff's enforceability challenges. "The FAA allows state law to invalidate an arbitration agreement, provided the law at issue governs contracts generally and not arbitration agreements specifically." *Bess v. Check Express*, 294 F.3d 1298, 1306 (11th Cir.

2002) (citing *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1996) (stating that "generally applicable contract defenses such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements")). Plaintiff argues that the arbitration agreement is unenforceable under Georgia contract law because its terms are indefinite and it is procedurally and substantively unconscionable. (Doc. 38 at 15-30). None of those arguments prevail.

### i. Indefiniteness

Plaintiff first argues that the arbitration agreement is unenforceable because it is too indefinite due to contradictory and incomprehensible terms. (Doc. 38 at 17). Specifically, Plaintiff contends the ADRPA and Arbitration Procedures contain contradictory and confusing terms regarding (1) the selection of an arbitrator; (2) the location of the arbitration; (3) whether there are other phases in the agreed upon alternative dispute resolution process; (4) how the parties should request arbitration under the agreement; (5) whether the parties may file a complaint in federal or state court; and (6) the rules and procedures governing an arbitration between the parties. (Doc. 38 at 17-20). The undersigned takes those arguments in turn.

"The law does not favor destruction of contracts on grounds of uncertainty. *Kitchen v. Insuramerica Corp.*, 296 Ga. App. 739, 743 (2009) (citing *Fay v. Custom One Homes*, 276 Ga. App. 188, 190(1)(a), 622 S.E.2d 870 (2005)). "Nevertheless, 'indefiniteness in subject matter so extreme as not to present anything upon which

the contract may operate in a definite manner renders the contract void.'" *Id.* (citing

*Fay*, 276 Ga. App. at 190).

> Under Georgia law, a contract does not exist unless the parties agree on
> all material terms. A contract cannot be enforced if its terms are
> incomplete, vague, indefinite or uncertain. Thus, a court will not
> enforce an agreement where it is left to ascertain the intention of the
> parties by conjecture.

*Id.* (quoting *Aukerman v. Witmer*, 256 Ga. App. 211, 214(1) (2002)). "The test of an

enforceable contract is whether it is expressed in language sufficiently plain and

explicit to covey what the parties agreed upon." *Id.* (quoting *Kueffer Crane, etc., Inc.*

*v. Passarella*, 247 Ga. App. 327, 330(3) (2000)).

In *Matthews v. Ultimate Sports Bar, LLC,* No. 1:13-CV-2353-TWT, 2016 WL

4035655, at *2 (N.D. Ga. Jul. 28, 2016), the only case cited by Plaintiff to support

his indefiniteness argument, this Court held that an arbitration agreement was

unenforceable, in part because "multiple sections of the agreement [were] simply

incomprehensible." For example, that agreement contained the following language:

"Unless except the agreement is governs the interpretation, enforcement and

proceedings by the Federal arbitration Act 9, USC 1, et se. To the extent that The

federal Arbitration Act is applicable or not to require arbitration of claims or claim,

GA law pertaining to the agreements can apply." *Id.* Further, it stated: "If a part of

this agreement is unenforceable, held voidable by any court or arbitrator there's

nothing in this agreement that shall limit its enforceability of any parts of the

40

agreement." *Id.* Moreover, the agreement was "missing essential terms, including how the parties selected an arbitrator and the governing authority…under which the arbitration would be conducted." *Id.* The terms Plaintiff identifies from the ADRPA and Arbitration Procedures here do not make this agreement so indefinite that it is unenforceable.

Regarding the selection of an arbitrator, the ADRPA states the parties must select "a retired federal judge unless a retired federal judge is not available to hear the dispute in a timely manner." (Doc. 20-1 at 74). The arbitrator also "must have a minimum of 5 years [sic] experience in the substantive practice area of the Dispute or in arbitrating similar types of Disputes." (*Id.*). The Arbitration Procedures state,

> [E]ach party agrees that all proposed arbitrators shall have a minimum of five (5) years of previous experience or background in the subject matter of the arbitration. In addition, the parties agree that the proposed *mediators* shall include as many retired federal judges as possible who are available to hear the dispute in [a] timely manner.

(Arbitration Procedures, Part III.A.1) (emphasis added). Plaintiff asserts those provisions are irreconcilably inconsistent. The Court disagrees. Both provisions indicate that the parties agreed to choose a retired federal judge with at least five years of experience in the substantive practice area of the dispute, if at all possible, while allowing flexibility on that criteria depending on availability of retired federal judges to arbitrate. The fact that the Arbitration Procedures mention "proposed

*mediators*" is not enough to eviscerate the parties' intent. It is obvious that term is referring to the selection of the arbitrator. These terms are not contradictory.

Regarding location of the arbitration, the ADRPA states, "At the sole election of SCAD, any mediations or arbitrations conducted pursuant to this ADRPA shall be held in Savannah, Georgia, Atlanta, Georgia, or the location where the employee lives or works." (Doc. 20-1 at 75). The Arbitration Procedures state, "The time and place for the arbitration hearing shall be determined by the mutual agreement of the parties. If the parties cannot agree, then the Arbitrator shall consult with the parties and determine a time and place for the hearing." (Arbitration Procedures, Part IX.B). Those two terms are contradictory, as one says the location of the arbitration is SCAD's decision alone, while the other says the parties must mutually agree upon a location. However, those contradictory terms are not enough to warrant voiding the entire arbitration agreement, especially given the federal policy in favor of arbitration. Instead, under the arbitration agreement's severability clause discussed above, the Court can sever one of those clauses and enforce the other. The severability clause signals an intent from the parties that any provision deemed unenforceable should be severed and the rest of the arbitration agreement should survive.[14] Therefore, to resolve the facially contradictory terms regarding the

---

[14] Plaintiff argues in his response brief that the Court should not sever any terms it finds unenforceable. (Doc. 38 at 30-32). That is inconsistent with the parties' intent, as expressed in the severability clause. Further, the authority he cites to support his

selection of the arbitration location, the Court will sever the term most favorable to SCAD, as the drafter, and enforce the other. The Court will sever the term giving SCAD sole power to decide the arbitration location. The parties shall decide the location of arbitration by consent, and if they cannot mutually agree, the arbitrator shall decide, according to Part IX.B of the Arbitration Procedures.[15]

Next, Plaintiff argues that the terms of the agreement are contradictory because the ADRPA "contemplates an internal review process followed by a mediation when a party requests arbitration" while the Arbitration Procedures "moved directly to the selection of an arbitrator when a request for arbitration is submitted." (Doc. 38 at 18). Those two parts of the agreement do not contradict one another. The ADRPA does state that the parties should first try to resolve any dispute between them through an internal review process at SCAD, then mediation, then

_____

position is distinguishable. Unlike in *Matthews*, 2016 WL 4035655, at *3, where this Court refused to sever unenforceable terms because it could not do so "without rewriting the agreement with respect to essential aspects[,]" in this case, the Court can sever one of the terms governing the selection of the arbitration location without rewriting essential aspects of the agreement.

[15] The Court will not sever the provision of the ADRPA following the severed provision, which states, "If SCAD elects to conduct a mediation or arbitration in a location other than the city where the employee lives or works, the employee will be reimbursed for reasonable and necessary travel expenses incurred for travel to the mediation or arbitration, including mileage and hotel fees." (Doc. 20-1 at 74). If during the parties' negotiations over the arbitration location SCAD insists that the parties arbitrate in a city other than where Plaintiff lives or works, then SCAD would be obligated to reimburse Plaintiff for travel expenses according to this provision. If the arbitrator ultimately decides the location of the arbitration, the travel-reimbursement provision will not apply.

43

arbitration. (Doc. 20-1 at 73-74). Those three phases, together, form the entire Alternative Dispute Resolution Policy and Agreement, or ADRPA. The Arbitration Procedures do not contemplate the internal review process or mediation, because they are the *arbitration* procedures. They are only applicable to the arbitration process. It is no wonder that the Arbitration Procedures fail to mention the other phases of the ADRPA.

Plaintiff next argues the ADRPA and Arbitration Procedures contain inconsistent terms regarding how Plaintiff should initiate arbitration. (Doc. 38 at 19). The Arbitration Procedures require an employee to a submit a "Request for Arbitration form" to the Vice President of Human Resources at SCAD in order to initiate arbitration. (Arbitration Procedures, Part I.A.). That form must "identify the legal claims to be arbitrated, the facts the party contends support such legal claims, and the relief being sought." (*Id.*). Meanwhile, the ADRPA states that an employee should initiate the alternative dispute resolution process, which would begin with the internal review by SCAD, by "making a written request to the vice president for human resources" that "should provide a brief statement of the dispute and the underlying facts." Those two terms are not contradictory. They both require the party seeking to resolve a dispute to initiate that process by submitting a form to SCAD's Vice President of Human Resources describing the dispute and the facts underlying that dispute. The terms may be worded slightly differently, but they clearly are

referencing the same step in the alternative dispute resolution process. These terms are not contradictory and do not make the material terms of the contract too indefinite to be enforced.

Next, Plaintiff says the agreement is contradictory because the Arbitration Procedures "contemplate[] a party filing a Complaint in federal or state court, at which point SCAD would send the party a 'Request to Arbitrate form[,]'" while no such filing of a complaint is accounted for in the ADRPA. (Doc. 38 at 19). The relevant Arbitration Procedures provision states:

> If a party files or causes to be filed in state or federal court a Complaint alleging a claim or cause of action which is subject to arbitration under the Alternative Dispute Resolution Policy and Agreement and these Procedures, the Vice President of Human Resources or a designated representative will notify the party or the party's attorney (if an attorney has entered an appearance) of the existence of the Alternative Dispute Resolution Policy and Agreement, and request that the case be dismissed.

(Arbitration Procedures, Part II). The fact that the Arbitration Procedures contemplate such a contingency but the ADRPA does not is irrelevant. The ADRPA and Arbitration Procedures together make up the entire arbitration agreement, so the fact that a term is mentioned in one document but not the other does not make the two documents contradictory. It means the agreement mentioned that contingency once, which is natural. This argument fails.

Lastly, Plaintiff argues that the terms discussing the procedural rules governing arbitration between the parties are confusing and contradictory. (Doc. 38 at 19). The ADRPA states:

> The following rules and procedures shall apply to and be followed in the arbitration phase of the ADRPA: statutes of limitations and standing requirements applicable to the substantive claim, all rules of pleading, all rights to discovery, all rules of evidence, and all rights to resolution of the dispute by means of motions for summary judgment and judgment on the pleadings. To the extent that there exists a choice between federal or state rules and procedures as identified above, federal rules and procedures shall apply.

(Doc. 20-1 at 74). While that provision could be made clearer, it is reasonably read as stating that any arbitration between the parties will be subject to the above-listed rules and procedures, i.e., there will be a statute of limitations, standing rules, rules governing pleadings, etc. Further, it is clear the parties intend for the federal version of such rules to govern where possible. For example, in an arbitration of Plaintiff's § 1981 claims, the statute of limitations for such claims will apply, federal standing rules will apply because § 1981 is a federal statute that creates federal subject matter jurisdiction, and so on. The language in the ADRPA is nothing like the relevant language in *Matthews*, cited by Plaintiff, which was "simply incomprehensible" and indecipherable. *Matthews*, 2016 WL 4035655, at *2. Plaintiff continues on, noting that the ADRPA also states the "parties agree that the arbitration shall be conducted in accordance with and subject to, the rules and procedures set forth in the Arbitration Procedures[,]" (Doc. 20-1 at 74), but asserting that the Arbitration

46

Procedures set out different rules and procedures that are not all consistent with the Federal Rules of Civil Procedure. (Doc. 38 at 19-20). As an example, Plaintiff notes that the Arbitration Procedures suggest that discovery during arbitration should "be conducted in accordance with Rules 26 through 37 of the Federal Rules of Civil Procedure" (Arbitration Procedures, Part VII.A.1.) but later sets out requirements that Plaintiff sign broad records releases allowing current and past employees and medical providers to release all records pertaining to him, depending on Plaintiff's underlying claim (*Id.*, Part VII.B.1-2.). Plaintiff contends the records release provisions are broader than and inconsistent with the Federal Rules of Civil Procedure. (Doc. 38 at 20). That may be true, but it does not make the arbitration agreement internally inconsistent. The general discovery provision cited by Plaintiff in the Arbitration Procedures, when read in full, states, "*Except as otherwise provided by these Procedures*, discovery and depositions shall be conducted in accordance with Rules 26 through 37 of the [FRCP]." (emphasis added). Thus, to the extent the records release provisions deviate from the FRCP, the parties accounted for some variance from the  federal discovery rules. Plaintiff cites no other discrepancies between the FRCP and the Arbitration Procedures. In fact, in laying out the rules governing arbitration, the Arbitration Procedures incorporate the applicable FRCP or Federal Rule of Evidence. (*See generally* Doc. 35-1). Further, the Arbitration Procedures state that they should generally be interpreted in a manner

consistent with the FRCP and Federal Rules of Evidence, to the extent those are not materially inconsistent with the express terms of the Arbitration Procedures or ADRPA. (Arbitration Procedures, Part XVIII). That is consistent with the parties' expressed intent in the ADRPA to have federal rules apply except as modified by the parties' agreement. The Court sees no fatal inconsistencies in the arbitration agreement regarding the rules and procedures that are to govern arbitration between these parties.

For all those reasons, Plaintiff's arguments that the arbitration agreement is so indefinite that it cannot be enforced are unpersuasive.

### ii.  Unconscionability

Next, Plaintiff argues that the arbitration agreement is unenforceable because it is procedurally and substantively unconscionable. (Doc. 38 at 16-17, 20-30). The Georgia Supreme Court has stated, "[T]he basic test for determining unconscionability is 'whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.'" *NEC Techs., Inc. v. Nelson*, 267 Ga. 390, 391 (1996) (quoting U.C.C. § 2-302 cmt.1). Unconscionable contracts have also been described as "such an agreement as no sane man not acting under a delusion would make, and that no honest man would take advantage of." *Id.*, n.2 (quoting *R.L. Kimsey Cotton*

*Co. v. Ferguson*, 233 Ga. 962, 966(3) (1975)). Georgia law recognizes both procedural and substantive unconscionability. *Id.* at 391-94 & n.6.[16] Under Georgia law, "[p]rocedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves." *Id.* at 392 (citations omitted). Some factors considered in determining procedural unconscionability are "the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *Id.* "As to the substantive element of unconscionability, courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the

---

[16] Defendant asserts that Georgia law requires a showing of both procedural and substantive unconscionability. (Doc. 20-1 at 9-10). This Court has stated as much on several occasions, relying on the same language from *NEC Technologies*. *Fatt Katt Enter., Inc. v. Rocksolid Granite,* No. 1:17-cv-1900-MHC, 2018 WL 482461, at *6 n.3 (N.D. Ga. Jan. 11, 2018) (citing *NEC Techs.*, 267 Ga. at 394 n.6), *Apollo MD Bus. Servs., LLC v. Amerigroup Corp.(Delaware)*, No. 1:16-cv-4814-RWS, 2017 WL 10185527, at *5 (N.D. Ga. Nov. 27, 2017) (same), and *Clark v. Aaron's, Inc.*, 914 F.Supp.2d 1301, 1310 (N.D. Ga. 2012) (Story, J.) (same). It is unclear whether *NEC Technologies* actually requires both types of unconscionability, as the court in that case found neither was present. *NEC Techs.*, 267 Ga. at 394 ("We pretermit the issue whether the lack of procedural unconscionability in this case is determinative of the unconscionability issue because we conclude that there is likewise an absence of evidence to support a finding of substantive unconscionability."). The Court need not resolve that question here, as neither procedural nor substantive unconscionability is present.

allocation of the risks between the parties, and similar public policy concerns." *Id*. The Court analyzes Plaintiff's arguments regarding each below.

### 1. Procedural Unconscionability

Plaintiff contends the arbitration agreement is procedurally unconscionable due to the indefiniteness of the terms and other facts regarding the agreement's conspicuousness, particularly that "the ADRPA is buried and undistinguishable from 141 other entries in the 64-page handbook, [] the ADRPA itself is in miniscule print with no subject headings", and the "link to the [Arbitration Procedures] itself is buried within the ADRPA and is not distinguished from the remaining text." (Doc. 38 at 21). Additionally, Plaintiff asserted in his response to the Second MTCA that (1) SCAD's HR staff "rushed" him and the other orientees through the onboarding documentation at orientation, which included the Acknowledgment alerting him to the existence of the ADRPA, (2) the HR staff failed to specifically call his attention to the Acknowledgment, (3) SCAD did not provide him with a signed copy of his Acknowledgment, but took it away after he signed it, and (4) SCAD never provided Plaintiff with a paper copy of the ADRPA or Arbitration Procedures. (Doc. 26 at 20-21). None of those arguments convince the Court that the arbitration agreement is procedurally unconscionable.

First, the Court has already addressed Plaintiff's indefiniteness arguments and found them to be unavailing. Second, the terms of the agreement are quite

conspicuous, despite Plaintiff's contention to the contrary. The ADRPA is located on pages thirty-four through thirty-six of a sixty-four-page, single-spaced handbook, but it is clearly set off and identified by a bolded heading in larger font than the surrounding text. (Doc. 20-1 at 73). Further, the staff handbook has an easily readable table of contents at the beginning of the document that lists the page on which the ADRPA begins, making it easy for a reader to find the ADRPA. (*Id.* at 37). Moreover, the ADRPA is not in "miniscule" print, but is printed in a reasonable size that is not difficult to read. While Plaintiff is correct that the hyperlink to the Arbitration Procedures is not set off from the rest of the text in the ADRPA, it is just as conspicuous as the rest of the text. The text of the hyperlink is the same size as the surrounding text, and it is even at the end of a paragraph, making it harder to miss than if it were in the middle of a paragraph with unbroken text on either side. Even still, the Acknowledgment form Plaintiff signed at his orientation specifically mentions that the ADRPA is in the handbook, notes that the ADRPA is binding on Plaintiff, states that he will read and comply with the ADRPA, and explains how he could access the handbook through SCAD's intranet. (*Id.* at 104). Based on the Acknowledgment, Plaintiff had no reason to have been unaware of the ADRPA's existence. There is no evidence to support Plaintiff's assertion that the terms of the agreement were inconspicuous.

51

Thirdly, the Court is not concerned by the circumstances surrounding Plaintiff's signing of the Acknowledgment or his ability to access the handbook containing the ADRPA at orientation or afterwards. Although Plaintiff says he subjectively felt "rushed" through his onboarding paperwork by the HR staff at his orientation, that is not enough to demonstrate unconscionability. He may have felt rushed, but he presents no evidence to suggest the HR staff rushed him intentionally to deceive or mislead him. He does not state that they ever denied a request by him to slow down their presentation or further explain any of the onboarding documents. Further, the fact that SCAD's employees failed to call his attention to the Acknowledgment or the ADRPA is of no relevance. The fact of the matter is Plaintiff still signed the Acknowledgement, signaling he read it and agreed with its contents. Further, SCAD's employees may have taken away his copy of the Acknowledgment after he signed it, thereby removing from his possession the only document explaining how to access the ADRPA, but at that point he had already signed the Acknowledgment stating that he had been given access to the handbook via MySCAD or a hard copy. The Court has no reason to believe that Plaintiff would not have been given a chance to access the handbook via MySCAD before submitting his signed Acknowledgment if he had so desired. Finally, the fact that he was apparently not provided with paper copies of the ADRPA or Arbitration Procedures before or during his employment with SCAD is also irrelevant, given

that he signed the Acknowledgment stating he had the opportunity to access the staff handbook containing the ADRPA electronically at his orientation, which would have led him to an electronic copy of the Arbitration Procedures. In sum, Plaintiff's abdication of his responsibility to seek out and read the arbitration agreement before assenting to it, despite being given the opportunity to do so, does not make the agreement procedurally unconscionable.

## 2.  **Substantive Unconscionability**

Plaintiff asserts the arbitration agreement is substantively unconscionable because of the allegedly prohibitive costs arbitration would impose on him, the lack of mutuality in the agreement, the "unrepresentative pool of arbitrators" from which he would have to choose, and its confidentiality provisions. (Doc. 38 at 22-30). Those arguments fail.

### a.  **Costs Of Arbitration**

Plaintiff argues that the arbitration agreement is unconscionable because the costs he could endure under the ADRPA's cost-shifting provision could prohibit him from effectively vindicating his claims under § 1981. (Doc. 38 at 22-25). This argument by Plaintiff fails because the cost-shifting is too speculative at this time.

The ADRPA has a cost-shifting provision that states:

Attorney's fees, expert witness fees, and costs shall be paid by the respective parties unless the arbitrator awards otherwise. In making his/her award, the arbitrator shall require the non-prevailing party to bear the cost of the arbitrator's fees, provided however, that SCAD will

53

advance the cost of the arbitrator's fees at the initiation of the arbitration, subject to reimbursement by the employee following arbitration if the employee does not prevail.

(Doc. 20-1 at 74).

Plaintiff argues that provision will prohibit him from effectively vindicating his § 1981 claims, because he cannot afford to pay the potential arbitrator's fees if he does not prevail at arbitration. He submits a declaration from Imre Szalai ("Szalai"), a law professor and purported expert in arbitration, who estimates that the arbitrator's fees associated with arbitrating arbitrability in this case could range from $2,100 to $8,400, and the fees for arbitrating the merits of this case could cost up to $39,600. (Doc. 38 at 22-23 (citing Szalai Decl. ¶¶ 9-17, 23)). Additionally, Plaintiff cites to his own sworn declaration describing his family's financial circumstances and stating, based on Szalai's estimates, that the $48,000 of potential arbitrator's fees that he could be forced to pay if he is made to arbitrate the arbitrability and merits of this case would be "financially disastrous" for him and his family. (Pl. Decl. ¶¶ 45-59). Finally, Plaintiff argues the cost-shifting provision is unconscionable because there is reason to believe SCAD "weaponizes" it against employees in arbitration to intimidate claimants into abandoning their claims, citing the declaration of Darnell Holcomb ("Holcomb"), a former SCAD employee who arbitrated a race discrimination claim against SCAD under the ADRPA in 2019 and 2020. (Doc. 38 at 24-25; Doc. 38-9 ("Holcomb Decl.") ¶¶ 1-9)). Holcomb attaches

excerpts from his deposition in his arbitration showing that SCAD's counsel asked him to confirm on the record that he understood the consequences of the cost-shifting provision of the ADRPA. (Holcomb Decl. ¶ 9; Doc. 38-10 at 9-11). Holcomb then states that his estimated exposure for the costs of arbitration was up to $200,000, which he would not have been able to afford. (Holcomb Decl. ¶¶ 10-11). Thus, he declares he accepted a settlement of his claims that he would not have accepted but for the ADRPA's cost-shifting provision. (*Id.* ¶¶ 12-14).

"[A]n arbitration agreement is not unenforceable merely because it may involve some 'fee-shifting.'" *Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1259 (11th Cir. 2003). The party seeking to avoid arbitration under an agreement containing a fee-shifting provision "has the burden of establishing that enforcement of the agreement would 'preclude' him from 'effectively vindicating [his] federal statutory right in the arbitral forum.'" *Id.* (quoting *Green Tree Fin. Corp.- Alabama v. Randolph*, 531 U.S. 79, 90 (2000)). The party seeking to avoid arbitration must "*demonstrate* that he is *likely* to bear such [prohibitive arbitration] costs." *Id.* at 1258 (emphasis in original) (alterations added). In *Musnick*, the Eleventh Circuit held that the plaintiff there had not met his burden of demonstrating that he was likely to bear the costs of arbitration under the "loser pays" provision in that arbitration agreement, because he had only submitted a vague affidavit saying that he would be unable to pay any potential attorneys' fee award against him. *Id.* at

1259-60. The court there found that Musnick had failed to make a sufficient record on the issue of prohibitive costs. *Id.* at 1260. Importantly, the court found there was no record that could have been made, because of the nature of the "loser pays" provision. *Id.* at 1261. Whether Musnick would eventually end up paying attorneys' fees "depend[ed] entirely on whether he prevails in arbitration." *Id.* Further, if he did not prevail at arbitration, the circuit court noted there was still only a possibility that he would be liable for costs and fees under the fee-shifting provision, despite the mandatory language of the provision, citing authority from other circuit courts indicating arbitrators can "determine whether contractual limitations on remedies are enforceable." *Id.* at 1261 & n.7 (citations omitted). Moreover, as the *Musnick* court noted, a party can seek judicial review of an arbitration award that the party believes is excessive or deprives him of his statutory rights. *Id.* at 1261 (citing *First Options*, 514 U.S. 938). Therefore, the circuit court held that "[a]rbitration is the correct initial forum for the [plaintiffs] to air their objection to the [loser pays] attorney's fees provision in the arbitration agreement." *Id.* at 1261-62 (citing *Thompson v. Irwin Home Equity Corp.*, 300 F.3d 88, 92 (1st Cir. 2002)). "Once the arbitrator has reached the issue of costs and fees, those items will no longer be speculative, and any issue presented thereby will be ripe for decision." *Id.* at 1262.

Here, Plaintiff goes further than the plaintiff in *Musnick*, submitting a declaration from an expert estimating the arbitrator's fees that might be shifted to

him if he does not prevail at arbitration. However, Plaintiff's argument that the cost-shifting provision here would prohibit him from vindicating his statutory rights is just as speculative as that argument in *Musnick*, because like in *Musnick*, Plaintiff will only take on those arbitrator's fees if he does not prevail at arbitration. Therefore, even taking as true Plaintiff's evidence regarding the estimated costs of the arbitrator's fees he would bear if he did not prevail, and taking as true his declarations regarding his ability to pay such estimated fees, there is simply no way for the Court to know whether Plaintiff is *likely* to pay those fees. The Court cannot predict whether Plaintiff is *likely* to prevail on the merits of his § 1981 claims. *Musnick*, 325 F.3d at 1258-62. Thus, the Court cannot say at this stage that the cost-shifting provision in the ADRPA will prevent Plaintiff from vindicating his statutory rights, and cannot find it unconscionable. Further, as the *Musnick* court noted, it is not guaranteed that an arbitrator would even be bound by the language of the cost-shifting provision, *Id.* at 1261 n.7, which makes it even more difficult to speculate whether Plaintiff is likely to pay the allegedly prohibitive arbitrator's fees. Even still, as noted in *Musnick*, if Plaintiff were forced to arbitrate his claims, did not prevail at arbitration, and was ordered to pay the arbitrator's fees, Plaintiff could appeal that award to a court. *Id.* at 1261.[17] Only then would it be appropriate for this Court to

---

[17] Plaintiff asserts, without citation, that the allocation of arbitrator's fees would not be appealable to a court of law. (Doc. 38 at 23). The undersigned does not see such a restriction in the terms of the agreement. In fact, the Arbitration Procedures say

review such a decision. As a result, the Court must reject Plaintiff's argument that the "loser pays" cost-shifting provision here is unconscionable.

Plaintiff's arguments based on Holcomb's declaration do not make the cost-shifting any less speculative or change the above analysis in any way. First, SCAD's apparent intent to seek enforcement of the cost-shifting provision in Holcomb's arbitration proceedings has no bearing on whether SCAD will attempt to enforce the cost-shifting provision here or, more importantly, the likelihood that Plaintiff will prevail on the merits of his case at arbitration. Thus, Holcomb's declaration is irrelevant in determining whether the cost-shifting provision of the ADRPA is unconscionable. Second, Holcomb's decision to settle his claims against SCAD due to his fear of having to bear the burden of arbitration costs have nothing to do with Plaintiff's own risk calculus. Holcomb's sworn estimated exposure due to the cost-shifting provision of $200,000 is much higher than Plaintiff's estimated exposure according to Szalai. Further, there is no way to compare the personal financial situations of Holcomb and Plaintiff, making Holcomb's declaration completely unhelpful in determining whether the cost-shifting provision will prevent Plaintiff from vindicating his statutory rights.

---

that the awards and orders of an arbitrator in this case would be subject to appeal to a second arbitrator, whose decision "may be enforced, vacated or modified by a court as provided by law." (Arbitration Procedures, Part XI.A-C).

For those reasons, Plaintiff's challenge to the enforceability of the arbitration agreement based on the cost-shifting provision mut fail.

### b.  Lack Of Mutuality

Plaintiff also argues the agreement is substantively unconscionable because it is non-mutual in the following ways: (1) giving SCAD, but not Plaintiff, the option to bypass the pre-arbitration internal review and mediation phases of the ADRPA; (2) giving SCAD, but not Plaintiff, the option to ignore the thirty-day notice requirement to indicate a dissatisfaction with a phase of the ADRPA and a desire to move to the next phase or appeal an arbitrator's decision to a second arbitrator; (3) giving SCAD the sole authority to select the arbitration forum; (4) giving the parties the ability to bring claims for injunctive or other equitable relief in court, but only in disputes that Plaintiff asserts are more likely to be brought by SCAD. (Doc. 38 at 25-28).

In *Caley*, the Eleventh Circuit, in applying Georgia contract law to the enforceability of an arbitration agreement, found that agreement was not unconscionable despite provisions requiring claims that would typically be brought by employees to be arbitrated while allowing other claims that would typically be brought by the employer to be litigated in court. *Id.* at 1378. In doing so, the *Caley* court found the provisions in question were still mutual because "both parties are required to arbitrate covered claims, and neither is required to arbitrate non-covered

59

claims." *Id.* Regardless, the Court noted, "Georgia law provides that 'an arbitration provision [is] not unconscionable because it lack[s] mutuality of remedy.'" *Id.* (citing *Saturna v. Bickley Const. Co.*, 252 Ga. App. 140, 141 (2001)). There were other asymmetries in the dispute resolution policy in *Caley*, such as provisions requiring the employee but not the employer to exhaust dispute resolution steps prior to arbitration, and provisions imposing thirty-day notice requirements for moving a dispute from one phase of the dispute resolution process to the next on the employee but not the employer. *Id.* at 1379. The *Caley* court found those provisions were "reasonably designed to resolve claims as quickly and efficiently as possible, consistent with the goals of arbitration, and not so offensive as to be unconscionable." *Id.*

Plaintiff's concerns regarding the mutuality of this arbitration agreement are similar to those expressed by the plaintiff in *Caley*. Therefore, like in *Caley*, they do not require a finding of unconscionability here. Assuming it is true that under the ADRPA the parties can only seek preliminary injunctive or equitable relief in court when the underlying claims are of the type that would normally be brought by SCAD, under *Caley*, that provision is not unconscionable. When certain types of legal claims are involved, "*the employee or SCAD* may…petition any court of competent jurisdiction and seek interim, injunctive or other equitable relief[,]" but neither can do so when other types of legal claims are involved. (Doc. 20-1 at 74-

75). Thus, that provision is mutual. Further, even if it were not mutual, as noted in *Caley*, Georgia law does not hold an arbitration provision unconscionable because of non-mutuality of remedy. *Caley*, 428, F.3d at 1378.

It is true that the ADRPA allows SCAD but not Plaintiff to bypass one or more steps of the ADRPA prior to arbitration. (Doc. 20-1 at 74). It is not true, as Plaintiff asserts, that SCAD is permitted to ignore the thirty-day deadline after each stage of the ADRPA for notifying Plaintiff that it is not satisfied with the resolution of that stage and would like to proceed to the next stage. The ADRPA states that if the internal review process fails to resolve a dispute, "at the election of either the Employee or SCAD within the time herein provided," the dispute can be referred to mediation. (*Id.*). If mediation does not resolve the dispute, then the dispute may be submitted to arbitration "at the election of either the Employee or SCAD within the time herein provided." (*Id.*). Later, it states, "SCAD and the employee shall *each* have thirty (30) calendar days from the end of each step in this ADRPA process to notify the other that they are not satisfied with the resolution at that stage of the ADRPA and wish to proceed to the next stage of the process." (*Id.*). Those provisions cannot be read any other way than requiring SCAD and Plaintiff to both abide by the same thirty-day deadline for notifying the other if they are unsatisfied with the resolution at any stage of the ADRPA. However, even if that obligation applied only to Plaintiff, it would not be enough to make this agreement unconscionable, even

when combined with the fact that SCAD is unilaterally allowed to skip any pre-arbitration phase of the ADRPA. As the Eleventh Circuit said in *Caley* regarding similarly asymmetrical provisions, they "are reasonably designed to resolve claims as quickly and efficiently as possible, consistent with the goals of arbitration," and they are not nearly so offensive as to shock the conscience and make this agreement unconscionable.

Lastly, the provision of the ADRPA giving SCAD sole discretion over the arbitration's location does not make the agreement unconscionable. Importantly, this argument is moot, because, as noted above in the discussion of Plaintiff's "indefiniteness" arguments, this term has been severed from the agreement. Additionally, this provision was not unconscionable to begin with. It required SCAD to choose between Savannah, Georgia; Atlanta, Georgia; or the city where Plaintiff lives or works. (Doc. 20-1 at 74). If SCAD were to choose a location other than where the employee lives or works, the provision required SCAD to reimburse the employee for reasonable and necessary travel expenses. (*Id.*). The severed provision giving SCAD the sole authority to select the location of the arbitration does not concern the Court or bring Plaintiff any closer to the high threshold for proving unconscionability.

For those reasons, the agreement is not so one-sided so as to make it unconscionable and unenforceable.

### c. **Selection Of The Arbitrator**

Plaintiff also contends the arbitration agreement is unconscionable because the "provision designating an unrepresentative and racially homogenous pool of potential arbitrators is contrary to public policy." (Doc. 38 at 28). Plaintiff is referring to the ADRPA provision stating the arbitrator "must be a retired federal judge unless a retired federal judge is not available to hear the dispute in a timely manner." (Doc. 20-1 at 74). He asserts that there are only two retired federal judges available to arbitrate in the state of Georgia, both of whom are white, citing to allegations in his First Amended Complaint. (Doc. 38 at 28). According to Plaintiff, the counties that make up the Northern District of Georgia are 35.5% Black. (*Id.*). Thus, Plaintiff contends, the provision showing a preference that the potential arbitrator be a retired federal judge "denies [him] a meaningful opportunity to have his claims heard by a panel of arbitrators reflecting his background" in violation of public policy. (*Id.* at 28-29) (quoting *Batson v. Kentucky*, 476 U.S. 79 (1986) (stating "[jury] selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.") and citing *Flanders v. State*, 279 Ga. 35, 42 (2005) (Benham, J., concurring) (noting that "the right to a jury drawn from a fair cross-section of the community" is ultimately a right that belongs to the community and not just the individual)). This argument is flawed in several ways.

First, the agreement does not strictly limit the pool of potential arbitrators to retired federal judges, but exhibits a strong preference for retired federal judges and allows for a different arbitrator to be selected in certain circumstances. (Doc. 20-1 at 74; Arbitration Procedures, Part III.A.1). Second, Plaintiff cites no authority for the notion that he has a right to an arbitrator selected from a pool that is representative of the demographics of his community, analogous to his right to select a jury from a representative cross-section of the community at trial. Therefore, the provision in question does not violate public policy on the basis asserted by Plaintiff.

### d.  **Confidentiality**

Lastly, Plaintiff argues the agreement is unconscionable because of its confidentiality provision. (Doc. 38 at 29-30). This argument fails as well.

The ADRPA states that all information and documents related to all stages of the ADRPA shall remain confidential and not be disclosed to any third party, including the media or other SCAD employees. (Doc. 20-1 at 75). The Arbitration Procedures contain an identical provision pertaining specifically to arbitration between the parties. (Arbitration Procedures, Part XIII). In *Caley*, the Eleventh Circuit recognized that confidentiality provisions in arbitration agreements between employees and employers are more favorable to employers, as they are more likely to be "repeat players" in the arbitration system. However, because both sides might desire confidentiality in many employment claims, such provisions are "not so

64

offensive as to be invalid." *Caley*, 425 F.3d at 1378-79 (citing *Rosenberg v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 8 n.4 (1st Cir.1999); *Iberia Credit Bureau, Inc. v. Cingular Wireless, LLC*, 379 F.3d 159, 175 (5th Cir. 2004)). Plaintiff acknowledges that holding from *Caley*, but asserts that the confidentiality provisions here, when combined with the other concerns he raises, are enough to make the entire arbitration agreement unconscionable. However, as explained in detail here, the Court does not buy any of Plaintiff's other unconscionability arguments. The confidentiality provisions alone are not enough to invalidate the entire arbitration agreement.

In sum, Plaintiff has failed to show that any part of the arbitration agreement is substantively unconscionable. The agreement remains enforceable.

### f.  Whether SCAD Waived Its Right To Arbitrate

After his unconscionability arguments, Plaintiff contends SCAD's motion should be denied because it has waived its right to arbitrate the claims here by "its failure to follow its own procedures and by pursuing confidentiality agreements with a key witness" to Plaintiff's case. (Doc. 38 at 32). Specifically, Plaintiff accuses Defendant of attempting to silence at least one former member of its fishing team, Pescitelli, by asking him to sign a confidentiality agreement in exchange for continuing to receive an athletic scholarship. (*Id.* at 7-8, 32-34). Plaintiff even presents the alleged confidentiality agreement SCAD offered Pescitelli in July 2019,

which Pescitelli did not sign. (Doc. 38-7). Plaintiff asserts that conduct by SCAD raises the question of whether it attempted to silence other former members of SCAD's fishing teams who would be potential witnesses in this dispute through confidentiality agreements. (Doc. 38 at 33-34). If any former fishing team members signed those agreements, Plaintiff claims they would be barred from voluntarily cooperating with his investigation prior to an arbitration hearing. (*Id.* at 33). Because arbitrators in this circuit cannot compel pre-hearing discovery from non-parties under the FAA, *Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1159 (11th Cir. 2019), confidentiality agreements between SCAD and potential witnesses would effectively prevent Plaintiff from being able to conduct any pre-arbitration hearing investigation related to former members of his fishing teams. (*Id.* at 33-34). Plaintiff analogizes this alleged conduct by Defendant to interference with third-party discovery in litigation and asks that the Court find that Defendant waived its right to enforce the arbitration agreement. (*Id.* at 34). In its reply brief supporting its Second MTCA, SCAD contends Plaintiff's evidence regarding the settlement agreement offered to Pescitelli is inadmissible hearsay. (Doc. 28 at 4). Defendant also denies that it has attempted to limit Plaintiff's access to witnesses in arbitration and asserts that the type of misconduct Plaintiff accuses SCAD of is not the type of conduct that results in waiver of a party's right to arbitrate. (*Id.* at 4-5).

Plaintiff's assertion that Defendant waived its right to arbitrate fails, because SCAD's alleged misconduct is not the type of conduct that usually results in waiver of the right to arbitrate, Plaintiff was not prejudiced by that conduct, and Plaintiff has not convinced the Court that Defendant intended to limit his ability to access witnesses during arbitration.

"[B]ecause federal law favors arbitration, any party arguing waiver of arbitration bears a heavy burden of proof." *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018) (quoting *Stone v. E.F. Hutton & Co.*, 898 F.2d 1542, 1543 (11th Cir. 1990) (per curiam)). In analyzing whether a party has waived its arbitration rights, the Eleventh Circuit first considers whether "under the totality of the circumstances, the party has acted inconsistently with the arbitration right." *Id.* (quoting *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1315-16 (11th Cir. 2002)). The "key factor in decided this is whether a party has 'substantially invoke[d] the litigation machinery prior to demanding arbitration.'" *Id.* (quoting *S&H Contractors v. A.J. Taft Coal Co., Inc.*, 906 F.2d 1507, 1514 (11th Cir. 1990)). Second, the Court must consider whether the offending party's conduct "has in some way prejudiced the other party." *Id.* (quoting *Ivax*, 286 F.3d at 1316). The purpose of the waiver doctrine is to prevent "outcome-oriented gamesmanship" in which a party "elects to forego arbitration when it believes that the outcome in litigation will be favorable to it, proceeds with extensive discovery and court proceedings, and then

67

suddenly changes course and pursues arbitration when its prospects of victory in litigation dim." *Id.*

Here, the conduct Plaintiff relies upon to support his contentions regarding waiver does not indicate Defendant has invoked the machinery of litigation prior to attempting to compel arbitration. Attempting to obtain a release of claims from a former student-athlete who was threatening to file suit against SCAD at least one year prior to SCAD even learning of Plaintiff's claims is simply not inconsistent with Defendant's intent to arbitrate this suit by Plaintiff. Further, Plaintiff has not shown he was prejudiced by Defendant's attempt to have Pescitelli sign a confidential release of claims. In fact, plaintiff concedes Pescitelli did not actually sign the release. (Pl. Decl. ¶ 38). Thus, no matter Defendant's intent in offering that agreement to Pescitelli, he is not actually prevented from voluntarily participating in Plaintiff's investigation of his case. Without a showing of prejudice, Plaintiff's waiver argument fails.

Plaintiff's attempt to analogize SCAD's conduct to witness interference in litigation does not change the outcome. In the cases cited by Plaintiff, where parties were found to have interfered in some way with a witness's ability to participate in court proceedings, the courts did not impose waiver on the offending parties and did not summarily dispose of issues in favor of the injured parties. *See WellStar Health Sys., Inc. v. Kemp*, 324 Ga. App. 629, 635 (2013) (affirming trial court's decision to

disqualify attorney who pressured non-party witness to not testify); *Residential Constructors, LLC v. ACE Prop. & Cas. Ins. Co.*, No. 2:05-CV-01318-BESGWF, 2006 WL 1582122, at *3 (D. Nev. June 5, 2006) (ordering the plaintiff not to instruct non-party witness not to speak with opposing counsel); *U.S. v. B&M Used Cars*, 114 F.R.D. 55, 56 (W.D.N.C. 1987) (sanctioning a U.S. attorney for instructing witnesses not to appear for a deposition). Even in *WellStar*, where WellStar's attorneys intentionally interfered with an expert witnesses' appearance and the opposing party was prejudiced, the Georgia Court of Appeals found the trial court abused its discretion by striking WellStar's answer and entering default judgment. *WellStar Health Systems*, 324 Ga. App. at 639-40. Therefore, even if Plaintiff had actually proven that SCAD participated in conduct akin to witness interference, the Court would not be compelled to find SCAD had waived its right to arbitrate.

g.  **Whether Claims Are Arbitrable Under the Agreement**

Based on all of the above analysis, the parties have entered into a valid and enforceable agreement to arbitrate. Next, the Court must assess whether "the issue [sought to be arbitrated] is arbitrable under the agreement[.]" *Lomax*, 228 F.Supp.2d at 1362. Defendant seeks to arbitrate Plaintiff's § 1981 claims. The ADRPA states that it applies to "all legal claims or controversies between SCAD and any employee, regardless of type." (Doc. 20-1 at 73). That broad language appears to encompass § 1981 claims of discrimination and retaliation. Plaintiff does not contend otherwise.

(*See* Doc. 38). Therefore, the issues sought to be arbitrated are arbitrable under the agreement.

### h.  Whether Plaintiff Has Failed Or Refused To Arbitrate Claims

Lastly, to compel arbitration, the Court must assess whether Plaintiff has failed or refused to arbitrate his claims that are covered by the arbitration agreement. *Lomax*, 228 F.Supp.2d at 1362. Indeed, there is evidence that SCAD's counsel asked Plaintiff to submit his claims to arbitration on multiple occasions, but he refused. (Doc. 20-1 at 105; Doc. 38-13; 38-14). With that, SCAD has met its burden on its motion to compel arbitration. Thus, the Court can and should compel arbitration of Plaintiff's § 1981 claims.

### i.  SCAD's Request For Sanctions

Before concluding, the Court must address SCAD's cursory request for attorneys' fees incurred in enforcing the ADRPA and vague request for sanctions against Plaintiff under Rule 11 of the Federal Rules of Civil Procedure ("Rule 11"). (Doc. 20-1 at 25 & n.15). Defendant does not lay out the standard for sanctions under Rule 11, much less explain how Plaintiff's conduct meets that standard. Further, any motion for sanctions under Rule 11 must be filed separately from any other motion, and it cannot be filed with the Court until the allegedly offending party has been served with a copy and been given twenty-one days to withdraw or correct the filing in question. FED. R. CIV. P. 11(c)(2). To the extent SCAD is seeking Rule 11

70

sanctions against Plaintiff or his counsel, he has not filed a separate motion for sanctions or proof that he provided Plaintiff with the twenty-one-day safe harbor required by the rule. Thus, any such request is denied. Defendant does not elaborate on any other legal basis for awarding it attorneys' fees in this case. Thus, this request for fees is denied.

### j.   Dismissal Or Administrative Stay

Lastly, given the conclusion that Plaintiff should be compelled to arbitrate all of his claims, the Court must decide whether to dismiss those claims from this court, as Defendant requests, or administratively stay the case. (*See* Doc. 20-1 at 24). Plaintiff does not put forth any arguments regarding the proper disposition of his claims in this Court if SCAD's motion to compel arbitration is granted. (*See* Doc. 38).

The Eleventh Circuit has previously held that 9 U.S.C. § 3 of the FAA requires courts to stay proceedings pending arbitration if parties are compelled to arbitrate. *McGhee v. Mariner Fin., LLC*, No. 1L19-cv-934-TWT-JFK, 2019 WL 5491825, at *6 (N.D. Ga. Aug. 7, 2019), *report and recommendation adopted by* 2019 WL 5491811 (N.D. Ga. Sept. 5, 2019), (citing *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 699 (11th Cir. 1992)). However, since *Bender*, the Eleventh Circuit has clarified that the mandate in § 3 of the FAA only applies to "any suit or proceeding…brought…*upon any issue referable to arbitration*" and only if the

parties ask the court for a stay: "the court…shall *on application of one of the parties stay the trial.*" *Id.* (citing *Utd. Steel, Paper and Forestry, Rubber, Mnfg, Energy, Allied Industrial and Service Works Intern'l Union AFL-CIO-CLC v. Wise Alloys, LLC*, 807 F.3d 1258, 1268 (11th Cir. 2015) (quoting 9 U.S.C. § 3, adding emphasis)). Further, since *Bender*, the Eleventh Circuit has affirmed at least one decision by this Court to dismiss a case where all the claims were covered by an arbitration agreement. *See Caley*, 428 F.3d at 1379 (affirming dismissal of claims subject to arbitration). Therefore, because Plaintiff's § 1981 claims are subject to arbitration and neither party requests that the Court stay the proceedings pending arbitration, the Court should dismiss Plaintiff's First Amended Complaint. *See Rayburn v. WebBank*, No. 1:18-cv-3127-JPB-CMS, 2019 WL 11499504, at *2 (N.D. Ga. Jul. 17, 2019) (recommending the plaintiff be compelled to arbitrate all claims and the case be dismissed), *report and recommendation adopted by* 2019 WL 1149501 (N.D. Ga. Aug. 6, 2019); *McGee*, 2019 WL 5491811, at *1 (adopting recommendation dismissing case after compelling arbitration of all remaining claims).[18]

SCAD met its burden of proving that the parties formed a valid arbitration agreement that applies to Plaintiff's § 1981 claims in this case, but Plaintiff has

---

[18] Plaintiff brings another claim seeking a declaratory judgment that the arbitration agreement is unenforceable. (Doc. 13). However, the Court has resolved that claim by granting Defendant's motion to compel.

refused to submit his claims to arbitration. Plaintiff's arguments that the agreement is unenforceable because it is indefinite, unconscionable, or because SCAD has waived its right to arbitrate all fail. Therefore, it is **RECOMMENDED** that Defendant's Refiled Motion to Dismiss and to Compel Arbitration (Doc. 35) be **GRANTED** and Plaintiff's First Amended Complaint (Doc. 13) be **DISMISSED**.

## II.   <u>Plaintiff's Motion For Limited Early Discovery</u>

Plaintiff also renews his Motion to Take Limited Early Discovery on Issues of Arbitrability. (Doc. 40). Plaintiff has not shown good cause for the Court to allow early discovery. This motion is denied.

### a.   <u>Legal Standards</u>

"Ordinarily, a party may not engage in discovery prior to the conference required under Federal Rule of Civil Procedure 26(f), with certain exceptions." *Thompson v. Does 1-5*, No 3:17-cv-146-TCB, 2018 WL 8997254, at *1 (N.D. Ga. May 8, 2018) (citing FED. R. CIV. P. 26(d)(1)). "However, a court may allow early discovery upon a showing of good cause." *Id.* (citing *Arista Records, LLC v. Does 1–7*, No. 3:08-cv-18(CDL), 2008 WL 542709, at *1 (M.D. Ga. Feb. 25, 2008)).

"Under the FAA, '[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.'" *Reed*, 2020 WL 5659436, at *7 (quoting 9 U.S.C. § 4). Additionally, "[t]he Eleventh Circuit has held that a summary-judgment like

standard should be applied to §4 when assessing whether a trial is necessary" on arbitrability. *Id.* (citing *Bazemore*, 827 F.3d at 1333). Thus, if there is no genuine dispute as to any material fact concerning arbitrability, then the Court can resolve the arbitrability disputes as a matter of law. *Id.* (citing *Bazemore*, 827 F.3d at 1333). If there is a dispute of material fact, the Court should proceed to trial on that issue. *Id.* (citing *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1346 (11th Cir. 2017)). Alternatively, the Court can allow for limited early discovery to determine whether there exists a genuine issue of material fact on a question of arbitrability. *Id.*

### b. **Analysis**

Plaintiff seeks limited early discovery into the following areas: (1) the parties' intent when agreeing any dispute between them would be governed by the version of the ARPA "in effect at the time a request for mediation and/or arbitration is initiated"; (2) SCAD's "posture on cost shifting in other arbitrations" with employees; (3) whether Defendant has allowed other parties in arbitration to select from a more diverse pool of arbitrators; (4) whether Defendant has permitted third-party discovery in prior arbitrations; and (5) the settlement negotiations between SCAD and Pescitelli and any confidential settlement agreement that may have been offered to other former fishing team members. (Doc. 40-1). For the reasons discussed below, there is not good cause for allowing discovery into any of those areas.

### i.  <u>Formation Of Contract And Meaning Of "In Effect"</u>

First, Plaintiff seeks limited early discovery regarding the parties' dispute over which version, if any, of the ADRPA was in effect in 2020 when SCAD requested arbitration of Plaintiff's claims. (Doc. 40-1 at 7-11). Specifically, Plaintiff contends that if the Court finds the term "in effect" in the ADRPA to be ambiguous but cannot resolve that ambiguity with Georgia's canons of contractual construction, then the Court should allow discovery into the parties' intent regarding that provision. (*Id.* at 10-11).

As explained above in the discussion of SCAD's Third MTCA, the "in effect" provision and modification provision in the agreement are not ambiguous, and the 2015 ADRPA and Arbitration Procedures govern Plaintiff's claims. *Supra*, Discussion, Part I.c.ii. Further, even if the relevant provisions were ambiguous, the Court can resolve that ambiguity in SCAD's favor in this circumstance using Georgia's statutory canons of construction and considering the federal policy favoring arbitration. Therefore, there is not good cause to open discovery into the parties' intent regarding the meaning of the ADRPA's "in effect" or modification provisions.

### ii.  <u>Cost-Shifting</u>

Plaintiff also moves for discovery regarding SCAD's use of the cost-shifting provision of the arbitration agreement in other arbitrations, arguing it "bears directly

on Plaintiff's claim that the cost shifting provision here is substantively unconscionable." (Doc. 40-1 at 12). Based on the evidence from Holcomb's deposition during his arbitration against SCAD, Plaintiff hypothesizes there could be evidence that SCAD "routinely weaponizes" the cost-shifting provision during arbitration to intimidate employee-claimants into dropping their claims. (*Id.* at 13). Any such weaponization, Plaintiff argues, would make any future, speculative cost-shifting a present, threatening reality for him during arbitration. (*Id.*). In other words, SCAD's emphasis on the cost-shifting provision during arbitration would have an immediate and certain impact on Plaintiff's willingness to continue his efforts to vindicate his § 1981 claims through arbitration. Thus, Plaintiff seeks discovery into the extent to which SCAD has emphasized the cost-shifting provision during arbitrations with other former claimants. There is not good cause for opening discovery into SCAD's behavior during arbitrations against other employees, as any such evidence would have no predictive value regarding SCAD's behavior during arbitration of the present case, and it would have no impact on the likelihood that Plaintiff will actually face additional costs under the cost-shifting provision.

First, SCAD's conduct regarding the cost-shifting provision in previous arbitrations is not predictive of its conduct during the arbitration of this dispute. There is no way to know to any degree of certainty whether SCAD will emphasize the consequences of the cost-shifting provision in proceedings with Plaintiff in an

76

attempt to convince him to abandon his claims. Because SCAD's conduct regarding the cost-shifting provision in previous arbitrations is not indicative of whether it will conduct itself in the same manner here, there is no good cause for opening discovery into that conduct. Secondly, even assuming that SCAD forces Plaintiff to acknowledge the cost-shifting provision of the ADRPA on the record during arbitration, as it did to Holcomb, such behavior would be irrelevant to the unconscionability of that provision. Such conduct would not have any impact on which party is more likely to prevail on the merits of Plaintiff's claims at an arbitration hearing. Thus, it will not impact the likelihood that Plaintiff will have to bear additional costs under the cost-shifting provision, which is the relevant question when determining the unconscionability of that provision. *Musnick*, 325 F.3d at 1259. Therefore, even if SCAD's "weaponization" of the cost-shifting provision in previous arbitrations was perfectly predictive of whether SCAD will do the same here, such conduct is irrelevant to this Court's analysis of whether the provision is substantively unconscionable. Therefore, there is no reason to open discovery into SCAD's posture toward cost-shifting in other arbitrations.

### iii.  Selection Of The Arbitrator

Next, Plaintiff seeks discovery into whether SCAD has enforced the provisions of the arbitration agreement governing the selection of the arbitrator or allowed claimants to draw on a more diverse pool of arbitrators. (Doc. 40-1 at 14).

That request is based on Defendant's statement that it has utilized arbitrators who are not retired federal judges in previous arbitrations in response to Plaintiff's assertion that the criteria in the arbitration agreement for selecting an arbitrator is unconscionable. (*See* Doc. 20-1 at 15-16 & n.9). However, the Court has explained why the provisions governing the selection of an arbitrator are not unconscionable, *see supra*, Discussion, Part I.e.ii.2.c., and the Court did not rely on Defendant's assurance that it has previously used arbitrators who were not former federal judges to arrive at that conclusion. Thus, there is no reason to open discovery into who SCAD has used as an arbitrator in the past or whether it strictly adhered to the selection criteria in the ADRPA.

### iv. __Allowance For Subpoena Of Non-Party Witnesses__

Plaintiff also seeks discovery into whether SCAD has allowed third-party discovery in prior arbitrations or attempted to shield such discovery under the Eleventh Circuit's decision in *Managed Care*. (Doc. 40-1 at 14). As noted above, in *Managed Care*, the Eleventh Circuit held that arbitrators in disputes governed by the FAA cannot compel non-party witnesses to participate in pre-hearing discovery proceedings, because arbitration is purely a creature of contract. *Managed Care*, 939 F.3d at 1159. "[A]n arbitrator's authority over the parties to an arbitration is limited by the contours of the parties' agreement and those enumerated in the [FAA]." *Id* at 1158-59 (quoting *Kennedy v. Am. Express Travel Related Servs. Co.*, 646 F.Supp.2d

1342, 1343 (S.D. Fla. 2009)). "Non-parties to an arbitration agreement have not subjected themselves to the authority of an arbitrator and, therefore, have not limited their rights beyond the FAA." *Id.* at 1159. The Eleventh Circuit then concluded that §8 of the FAA "withholds the power to compel documents from non-parties without summoning the non-party to testify[,]" "thus prohibiting pre-hearing discovery from non-parties." *Id.* at 1159-60. Defendant insists that pre-hearing discovery from non-parties is allowed under the terms of the arbitration agreement here. (Doc. 28 at 21 n.13). Thus, Plaintiff seeks discovery into whether SCAD has ever held a different position and "used *Managed Care* as a shield against third-party discovery in prior arbitrations." (Doc. 40-1 at 14). Such discovery is unnecessary as such information is irrelevant to the resolution of the motion to compel arbitration.

Despite SCAD's insistence to the contrary, under *Managed Care*, an arbitrator in this case could not compel a third-party witness to participate in pre-arbitration hearing discovery, no matter what the parties' agreement says. SCAD's position in prior arbitrations regarding whether an arbitrator can compel third-party pre-hearing discovery is irrelevant here precisely because of the prohibition in *Managed Care*. Regardless of SCAD's position on the holding in *Managed Care* in previous arbitrations, that case and its holding govern this arbitration. Further, Plaintiff's concern about pre-hearing discovery is only relevant to his argument that SCAD waived its right to arbitrate in this case by purportedly offering at least one former

member of its fishing team a confidential settlement that would possibly prevent him from voluntarily participating in any pre-arbitration hearing investigation in this case. (Doc. 38 at 32-34). Under that theory, Plaintiff is already assuming that compelled non-party, pre-hearing discovery is off limits under *Managed Care*. More importantly, as explained above in addressing the motion to compel arbitration, Plaintiff's waiver argument fails. Plaintiff was not prejudiced by SCAD's unsuccessful settlement offer to Pescitelli, and SCAD's conduct regarding Pescitelli was not the type of conduct that warrants waiver of the right to arbitrate. Nothing that Plaintiff might find in discovery regarding SCAD's position on formal pre-hearing discovery of non-parties in prior arbitrations would change the above facts regarding Plaintiff's waiver argument. Thus, there is not good cause for allowing discovery into SCAD's prior position on the arbitrator's ability to compel thirty-party, pre-hearing discovery.

### v.  <u>Settlement Offers to Pescitelli and Other Team Members</u>

Lastly, Plaintiff seeks discovery into "the circumstances of the settlement negotiations [between SCAD and Pescitelli], including the nature of Mr. Pescitelli's claims and whether they involved similar allegations to those Plaintiff makes in the instant litigation[.]" (Doc. 40-1 at 15-16). Additionally, Plaintiff requests discovery into "any agreements the former Fishing Team members may have signed that would

impact their voluntary cooperation with proceedings in arbitration." (*Id.* at 16). There is not good cause for allowing discovery into any of those subjects.

As just explained, Plaintiff's waiver arguments to which these discovery requests relate unequivocally fail. Even if SCAD did attempt to have Pescitelli and other fishing team members sign confidentiality agreements in a deliberate attempt to inhibit their ability to voluntarily participate in Plaintiff's pre-arbitration hearing investigation, such conduct is not the type of conduct that generally results in waiver of the right to arbitrate. *See supra*, Discussion, Part I.f. The evidence already shows Pescitelli did not sign the settlement of claims SCAD offered him, meaning he is not prohibited from voluntarily participating in Plaintiff's pre-hearing investigation, and Plaintiff is not prejudiced by SCAD's conduct. For those reasons, the Court can already conclude that Plaintiff's waiver argument fails, and further discovery into the circumstances surround the settlement offer to Pescitelli is irrelevant and unnecessary.

Moreover, SCAD has already submitted evidence that the former members of the fishing team did not sign confidentiality agreements in exchange for having their scholarships continued once the team was discontinued in 2019, "or otherwise agree to confidentiality." (Alletto Decl. ¶ 8). That declaration resolves the matter and eliminates any good cause there may be for opening discovery into whether SCAD

attempted to have former fishing team members agree to confidentiality regarding circumstances pertaining to this dispute.

In sum, there is not good cause to open limited early discovery into any of the issues upon which Plaintiff seeks discovery. The Court can decide Defendant's MTCA without any additional evidence. It is **ORDERED** that Plaintiff's Second Motion for Limited Discovery be **DENIED**.

## CONCLUSION

For the reasons stated above, it is **RECOMMENDED** that SCAD's Refiled Motion To Dismiss and to Compel Arbitration (Doc. 35) be **GRANTED** and Plaintiff's First Amended Complaint (Doc. 13) be **DISMISSED**. Further, it is **ORDERED** that Plaintiff's Renewed Motion to Take Limited Early Discovery on Issues of Arbitrability (Doc. 40) be **DENIED**.

The Clerk is directed to terminate the referral to the undersigned.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 4th day of November, 2021.

/s/ J. Clay Fuller
J. Clay Fuller
United States Magistrate Judge

82